**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ricardo Alvarez GUTIERREZ, Jorge Eliecer Palacio, Jairo Rendon, Osmundo Roque, Jose Palma–Rodriguez, Manuel Palma–Rodriguez, Defendants–Appellants.**

No. 89–3938.

United States Court of Appeals, Eleventh Circuit.

May 29, 1991.

Daniel F. Martinez, II, Gonzalez & Martinez, P.A., Tampa, Fla., for Gutierrez.

Eric M. Cohen, Eric M. Cohen, P.A., Coral Gables, Fla., for Palacio, Rendon, Roque.

Roy Rodriguez, Miami, Fla., for Jose Palma–Rodriguez.

Dennis N. Urbano, Miami, Fla., for Manuel Palma–Rodriguez.

Thomas F. Almon, Miami, Fla., for Palma–Rodriguez.

Jeffrey Downing, Asst. U.S. Atty., Tampa, Fla., for U.S.

Before HATCHETT and BIRCH, Circuit Judges, and RONEY, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this cocaine importation case, we affirm the appellants' convictions, but vacate the sentence of one appellant and remand for resentencing.

## FACTS

In the spring of 1988, undercover drug agents in Tampa, Florida, set up a sting operation in which they portrayed drug smugglers with sailboats equipped and ready to transport cocaine from Colombia to the United States. During the course of

the operation, a confidential informant known as "Jaime Velez" acted as the undercover agents' boss.

On May 11, 1988, United States Customs Special Agent Victor Thompson and Velez met with Manuel Palma–Rodriguez (Manuel Palma), Fernando Lara–Rubiano (Lara), and Jorge Castillo to negotiate a fee for the use of a sailboat to smuggle cocaine from Colombia to the United States. Manuel Palma indicated that his contacts in Colombia were interested in shipping several hundred kilograms of cocaine. Thompson stated that he had two sailboats available. After the men inspected the first boat, Manuel Palma wanted to see the second and larger vessel—the *Bonnie Dundee*. Manuel Palma later inspected that vessel, advised that he wanted to use it to import cocaine, and directed Castillo to take pictures of the vessel for the Colombian suppliers. Manuel Palma agreed to pay $30,-000 in front money to Thompson to prepare the vessel for the shipment.

On May 26, 1988, Thompson met with Manuel Palma and Manuel's brother, Jose, and again inspected the *Bonnie Dundee*, walking through the vessel and examining all its concealed compartments. During inspection of the engine room, Jose Palma stated, "In this animal, we could carry a lot of cocaine." He also told Thompson that he lived in Tampa and that Thompson could contact him to assist when the cocaine arrived in Tampa. After Manuel Palma and Thompson discussed the payment of the front money, Manuel Palma told Thompson that he (Manuel) could be reached through Jose, and that if anything had to be done in Tampa, Manuel would contact Jose to get it done. Five days later, Thompson and Velez traveled to Miami, Florida, to receive the front money from Manuel Palma, but Manuel told them that he did not have the money because of a miscommunication with the suppliers in Colombia.

Thompson met Manuel Oria June 10, 1988, in Tampa. Oria told Thompson that Manuel Palma had sent him to see the *Bonnie Dundee* and that he (Oria) was interested in placing several hundred kilograms of cocaine on the vessel and willing to pay front money. Oria and Thompson agreed that this load of cocaine would be placed on the *Bonnie Dundee* with the cocaine that Thompson and Manuel Palma had discussed in May.

In August, 1988, Thompson, Tampa Police Detective Vincent Rodriguez and Velez met with Oria and Jairo Rendon. Oria and Rendon specified that they wanted to import approximately 310 kilograms of cocaine. Oria said that Rendon would be responsible for distributing the cocaine in Miami. Oria and Rendon agreed to pay $30,000 in front money, and Oria agreed to pay Manuel Palma $5,000 for putting Oria together with Thompson.

On September 17, 1988, Oria contacted Thompson and told him that Oria had legal problems and had to leave the country. Oria stated that Alberto Fernandez would handle the receipt and distribution of the cocaine. Five days later, Thompson and Rodriguez met Fernandez in Tampa, and Fernandez acknowledged that he would be taking over and looking after Oria's interest in the cocaine shipment. Fernandez also stated that he wanted to introduce Thompson and Rodriguez to his father-in-law, Ricardo Gutierrez. Fernandez introduced the men and said to Gutierrez, "I want you to meet these people because you'll be seeing them again."

On October 10, 1988, the undercover agents imported 673 kilograms of cocaine into the United States at Fort Myers, Florida. The next day, Special Agent Russell Reina of the Drug Enforcement Administration (DEA) and Velez met with Jorge Palacio and Everado de la Hoz in Tampa. After learning that the cocaine was in Florida, Palacio stated he was ready to have his share of the cocaine taken to Miami where he would make arrangements for a $300,-000 payment at the time of delivery. The following day, Reina took Lara to the warehouse which stored the cocaine. Lara identified 11 of the kilograms as belonging to him, 323 kilograms as belonging to Fernandez, and 339 kilograms as belonging to Palacio.

At a restaurant, Thompson and Lara coincidentally met Jose Palma. At this

meeting, Jose wanted to know if the cocaine had arrived in the United States and told them that Manuel wished to speak with them. After learning that the cocaine had arrived, Jose said, "Well, then, we need to get together to get the money that is owed to myself and my brother Manuel." Manuel Palma later told Thompson he wanted to make sure he (Manuel) would get what he had earned, a fee for putting the connection together and for arranging the transportation.

On October 18, 1988, Reina, Thompson, and Velez met Lara and Fernandez in Tampa. Fernandez had come to Tampa to take 30 of his 323 kilograms to his Miami residence where buyers would purchase the cocaine. Fernandez would then return to Tampa and purchase the remaining cocaine. At a hotel, Reina was introduced to Gutierrez. All the men decided that Gutierrez would rent a car to move the cocaine to Miami. Shortly thereafter, Thompson and Gutierrez traveled to automobile rental locations, but they were unable to rent an automobile for various reasons. During this time, Gutierrez told Thompson, "We have to be very careful because I heard of a big problem here that occurred recently, ... and there is federal agents all around us and we have to be careful who we're dealing with.... [W]e've got to be very careful because we are going to be taking this down to Miami and I don't want to get into any kind of problems."

The following morning, October 19, 1988, Thompson and Reina placed thirty kilograms of cocaine into their own automobile and met Lara, Gutierrez, and Fernandez near the interstate in St. Petersburg, Florida. Thompson drove the car loaded with cocaine to Miami, but the cocaine was never delivered to Fernandez, Lara, or Gutierrez. Law enforcement officials subsequently arrested Fernandez, Lara, Gutierrez, and others.

Later that day, Reina and Palacio arranged to meet in a grocery store parking lot in Miami. DEA Special Agent Glenn Schneider established surveillance of the parking lot. Soon after Reina and Velez arrived in one automobile, a yellow Buick pulled into the lot and parked. The driver, Magin Cabrera, opened the door, stepped partially out of the car, and then reentered it. He then drove the automobile to a second parking spot in the lot. At the second location, Cabrera and Osmundo Roque got out of the automobile and walked to some pay telephones near the shopping center. Both men constantly looked out into the parking lot, and after Cabrera made a call, they got back into the automobile. Shortly, Palacio and de la Hoz entered the parking lot in a blue van. Palacio and de la Hoz left the van and went into Reina's automobile where Palacio asked about the cocaine. Reina replied that Palacio's 340 kilograms were en route. Palacio stated that he had two men in the parking lot who would drive the cocaine to his residence where it would be inventoried. Simultaneous with the inventory, Reina, Palacio, and de la Hoz would go to another location to exchange the money. After agreeing to show Reina where his residence was located, Palacio told Reina that he needed to tell his men to wait in the lot for their return. Palacio and de la Hoz then got back into the van, drove over to Cabrera and told Cabrera they "would be right back." Cabrera then looked at Reina, waved his hand, and walked over and spoke with Roque who was about fifteen feet from the van.

That evening, Reina telephoned Palacio and told him the cocaine had arrived. Palacio told Reina to return to the grocery store parking lot. On the way to the lot, de la Hoz called Reina by mobile phone and changed the location of the meeting because Palacio's men had seen some unusual activity at that location. After the parties arrived at the new location, de la Hoz told Reina that he and Palacio had the money. Velez went with de la Hoz to see the money. Velez and de la Hoz crossed the street between the two parking lots in which Reina's and Palacio's automobiles were parked. Reina saw de la Hoz and Velez go into a small cafe across the street. Velez, de la Hoz, and Palacio came out of the cafe, and Reina noticed Cabrera standing near the front of the cafe. Palacio and Velez walked to the rear of a Chevrolet, at which

time Reina noticed Roque walking away from the vicinity of the Chevrolet. Palacio and Velez looked into the trunk of the Chevrolet. Velez and Cabrera returned to Reina's automobile. After Reina was satisfied that Velez had seen the money, Reina told Cabrera that Reina would get the cocaine. Reina noticed Roque drive into the parking lot in a brown van. Roque parked the van, remained in the vehicle, and looked around the lot, paying particular attention to Reina's automobile. Palacio and de la Hoz then drove the Chevrolet into the lot and stopped near Reina's automobile. Reina gave the arrest signal, and as Palacio, de la Hoz, and Cabrera were being arrested, Roque tried to leave the parking lot, but was arrested. Law enforcement officers found a suitcase with over $300,000 in cash in the trunk of the Chevrolet.

## PROCEDURAL HISTORY

On October 27, 1988, a federal grand jury in the Middle District of Florida returned a superseding indictment charging the appellants (Gutierrez, Palacio, Manuel Palma, Jose Palma, Rendon, and Roque) with various drug offenses. Jose Palma and Rendon both filed motions for an order requiring the government to disclose the identity and existence of confidential informants. The magistrate judge denied Rendon's motion without a hearing, but held a hearing on Jose Palma's motion. After the hearing, the government filed an *in camera, ex parte* supplemental response to the motion. The response evidently included an affidavit which related threats made to Velez's safety. The *in camera* material is not in the record. On May 5, 1989, the magistrate judge denied Jose Palma's motion. Rendon then filed a second motion to compel the presence of confidential informants and undercover agents at trial, and the magistrate judge denied this motion July 7, 1989.

Trial commenced July 10, 1989. During trial, Manuel Palma moved for severance, but the district court denied the motion.

After Rendon renewed his motion to compel the government to produce Velez or to reveal Velez's true identity, the district court ordered the government to produce Velez. The government, however, could not locate Velez. The district court found that the government had made a reasonable effort to find Velez and denied the motion to discover Velez's true identity.

On July 27, 1989, the jury convicted Gutierrez, Palacio, and Roque of conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. The jury convicted Manuel and Jose Palma of conspiracy to import five kilograms or more of cocaine into the United States, in violation of 21 U.S.C. § 963. The jury convicted Rendon of conspiracy to import five kilograms or more of cocaine into the United States and of conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841, 963.

## CONTENTIONS

Jose Palma, Gutierrez, and Roque contend that the evidence is insufficient to support their convictions.

Rendon, Jose Palma, and Manuel Palma contend that the district court erred in allowing the government to withhold Velez's true identity or in its finding that the government made reasonable efforts to locate Velez.

Manuel Palma also contends that the district court erred in denying his motion for severance.[1]

Roque contends that at his sentencing hearing, the district court improperly determined his base offense level on a quantity of cocaine that was neither known to nor foreseeable to him.

The government contends that the district court ruled properly, except that the government agrees Roque should be resentenced.

---

**1.** Manuel Palma and Palacio also contend that the district court erred in denying their evidentiary motions and in determining their sentences. After reviewing the record, we find these contentions to be without merit.

## ISSUES

The issues are: (1) whether the evidence is sufficient to support the convictions of Jose Palma, Gutierrez, and Roque; (2) whether the district court erred in allowing the government to withhold Velez's true identity or in its finding that the government had made reasonable efforts to produce Velez; (3) whether the district court erred in denying Manuel Palma's motion for severance; and (4) whether the district court erred in setting Roque's base offense level.

## DISCUSSION

### I. Sufficiency of the Evidence

 In examining the sufficiency of the evidence in a criminal case, we view the evidence in the light most favorable to the government, drawing all reasonable inferences from the evidence in favor of the jury's verdict. *United States v. Thomas,* 676 F.2d 531, 535 (11th Cir.1982). The verdict must be sustained if any reasonable construction of the evidence allowed the jury to find guilt beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[2]

"To prove a conspiracy, the government must prove that the conspiracy existed, that the defendants knew of it, and that with knowledge, they voluntarily joined it." *United States v. Sullivan,* 763 F.2d 1215, 1218 (11th Cir.1985) (citations omitted). Jose Palma argues that the government established nothing more than his knowledge that his brother Manuel was involved in a smuggling venture. He also argues that his statement that the *Bonnie Dundee* could hold a lot of cocaine does not mean that he was a part of the plan to import cocaine. According to Jose Palma, his offer to help Thompson after the cocaine had arrived does not demonstrate participation in the conspiracy because the offer was for assistance after the importation had been accomplished.

Gutierrez argues that he accompanied Fernandez to Tampa only because Fernandez's driving privileges had been suspended. He also contends that when he met the undercover agents in September, 1988, no part of their discussion referred to the deal Fernandez had been negotiating with the agents. Finally, Gutierrez asserts that during the October 18, 1988, meeting with the agents, the word "cocaine" was never used. According to Gutierrez, because no one ever used the word "cocaine" during a tape-recorded meeting, it is unbelievable that open and direct references to cocaine were used in his presence at the unrecorded meeting in the hotel.

Roque contends that the evidence against him consists solely of his presence at two locations on one day. According to Roque, mere presence in the vicinity of a proposed cocaine transaction, even if coupled with flight, cannot support a conviction for conspiracy to possess with intent to distribute cocaine. *United States v. Pintado,* 715 F.2d 1501, 1504 (11th Cir.1983). Roque contends that although Palacio made a reference to his "men" being in the first parking lot, Palacio never identified those men. According to Roque, even if he was one of Palacio's men, nothing indicates that he knew of the illicit nature of the cargo to be transported.

 Contrary to the appellants' assertions, we conclude that the evidence is sufficient to sustain their convictions. By inspecting the *Bonnie Dundee* to ensure its readiness for importation, a reasonable jury could infer that Jose Palma associated himself with the illegal venture and sought to make it succeed. Jose Palma also indicated his willingness to assist in the offload of the cocaine and expected that he would be paid for arranging for the use of the vessel. This evidence is sufficient to sustain Jose Palma's conviction on the charge of conspiracy to import cocaine.

 Gutierrez also implicated himself in the illegal scheme. During the hotel meeting, Gutierrez, Fernandez, Lara, and

---

2. Decisions of the former Fifth Circuit, Unit B, are binding precedent in this circuit. *Stein v.* *Reynolds Securities,* 667 F.2d 33, 34 (11th Cir. 1982).

government agents openly discussed how the "cocaine" would be transported to Miami. Reina explained to Gutierrez that the vehicle needed to have a trunk that was large enough to hide thirty kilograms of cocaine. While attempting to rent an automobile, Gutierrez made statements indicating that he was aware of the purpose of the venture. The evidence reveals Gutierrez's knowledge of the goal of the conspiracy and actions on his behalf to make it succeed.

■ Finally, a jury could reasonably determine that Roque's activities at the two parking lots went beyond "mere presence" and were not coincidental to the conspiracy. *See United States v. Paone,* 758 F.2d 774 (1st Cir.1985). Roque's initial searching of the first parking lot is consistent with conducting countersurveillance. *United States v. Pui Kan Lam,* 483 F.2d 1202, 1208 (2d Cir.1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974). The evidence is sufficient to show that Cabrera was one of the two men that Palacio had watching the parking lot, that the only person seen with Cabrera on each occasion in the lot was Roque, and that Roque was the second of Palacio's men.

## II. The Government's Failure to Produce the Confidential Informant

After the magistrate judge had denied at least three motions to compel the government to reveal the identity of or to produce Velez, the confidential informant, the appellants next raised the issue ten days into trial, Thursday, July 20, 1989. At that time, Rendon's counsel stated, "I think the matter now has ripened, certainly, much more so than a pretrial setting. And I am renewing my motion concerning the production of Mr. Velez." In discussing the prospect of producing Velez, the prosecutor volunteered, "I don't even know where he is. I will have to try to find out where he is." The district court then told the prosecutor, "Well, maybe you should undertake to do that. And make a determination or at least be making preliminary plans, depending on what sort of ruling I might

make tomorrow, concerning his being here Monday."

The next morning, all parties agreed that the district court had yet to rule whether the government had to produce Velez or reveal his identity. After the district court had excused the jury for lunch, the district court heard evidence *in camera* regarding the government's interest in withholding Velez's identity. The district court stated:

> The only Defendant that I have much inclination of finding or suggesting that there could be some arguable need for [disclosure] in the light of all of the balancing and the circumstances would be Mr. Rendon....
>
> If the witness were unquestionably available, and then as far as Mr. Rendon is concerned particularly I might require his presence. Well, maybe I will do it initially anyway. Also, though, in my conversation with the Government, I have been advised that after I suggested to [the prosecutor] yesterday that some effort—I mean that some preliminary effort be made to determine the availability of the witness to be present here by Monday, that significant effort in that regard has been extended but that the efforts which have been made have been unsuccessful in locating that witness.
>
> So what it comes down to is this, and I am in effect directing that the Government make continued substantial efforts to have the witness here Monday, particularly as it would relate to Mr. Rendon. I am not, in the course of making that balancing, I am not intending to imply in any way that his absence would create some total prejudice as to Mr. Rendon. Neither am I trying to suggest what the Government's responsibility in that regard would be if indeed he is unavailable. But I am just saying for the time being that—I'm asking that the Government continue to attempt to locate him, and we'll have to see where it goes.

Rendon's counsel sought clarification and asked, "But you are ordering them to produce Mr. Velez at this time?" The district court replied, "Right."

When court reconvened Monday morning, the prosecutor notified the district court that law enforcement agents had been unable to locate Velez over the weekend. That afternoon, the district court held a hearing regarding the efforts made by the government to determine Velez's availability. Special Agent Thompson testified that he had gone four times Friday to the location where Velez usually resides, but could not find Velez. Thompson went to the same location seven times Saturday and several times Sunday, but was still unable to locate Velez. Thompson also placed numerous telephone calls throughout the weekend to various residences where Velez had been reached in the past and to Velez's friends and relatives, but the agent was still unsuccessful in locating Velez. Thompson acknowledged that the last time he had met with Velez was July 6, 1989, four days before the start of trial. At that time, Thompson told Velez to be available for trial, but did not serve Velez with a subpoena. Velez told Thompson that he (Velez) was going to leave the area because his life had been threatened, but that he would try to be available for trial.

Two ways exist for viewing the district court's orders. Under the first view, the district court initially denied the motion to disclose Velez's true identity, but later granted the motion to disclose true identity by requiring the government to produce Velez at trial. Under the second view, the court intentionally denied disclosure of Velez's true identity, but granted the motion to have the government produce Velez at trial. If the record is considered as one where the district court granted the motion for disclosure of Velez's true identity as well as the motion for production, the only error of which the appellants may complain is the district court's finding that the government put forth reasonable efforts to find Velez. For resolution of this issue, we view the record as one where the district court intentionally denied the appellants' motions to disclose Velez's true identity, but granted the appellants' motions to produce Velez at trial. This view of the record is the one most favorable to the appellants.

We begin our analysis with the district court's ruling that the government was not required to disclose Velez's true identity. Although the government has the privilege to withhold from disclosure the identity of its informants, this privilege is limited. *Roviaro v. United States*, 353 U.S. 53, 59–61, 77 S.Ct. 623, 627–628, 1 L.Ed.2d 639 (1957). The *Roviaro* Court stated that in determining when the government's privilege must give way to a defendant's right to prepare his defense, a court must engage in a balancing test, taking into account the particular circumstances of each case, the crime charged, possible defenses, and the potential significance of the informant's testimony. 353 U.S. at 62, 77 S.Ct. at 628. If disclosure is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60–61, 77 S.Ct. at 627–628.

In *United States v. Tenorio–Angel*, 756 F.2d 1505, 1509 (11th Cir.1985), we noted that in applying the balancing test to determine if disclosure is required, "[s]ubsequent case law has focused the inquiry on three factors: the extent of the informant's participation in the criminal activity, the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant, and the government's interest in nondisclosure." (Citations omitted.) We review the denial of a motion to disclose the identity of a confidential informant under an abuse of discretion standard. *United States v. Parikh*, 858 F.2d 688, 696 (11th Cir.1988).

The government acknowledges that Velez's participation in this case was substantial. Thus, because this is not a case in which the informant acted as a mere tipster, to permit nondisclosure of the informant's identity requires further consideration. *See United States v. Diaz*, 655 F.2d 580 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982) (recognizing that the *Roviaro* principle does not require disclosure of a mere tipster's identity). Nor is this a case in which the government is

required to disclose the informant's identity because the government's informant was the sole participant other than the accused. *See Roviaro,* 353 U.S. at 64–65, 77 S.Ct. at 629–630. Velez was always with at least one government agent who could testify to everything which occurred except for a few instances in which Velez spoke with the appellants while no government agent was present; consequently, Velez's involvement in the criminal activity alone does not mandate disclosure.

■■■ We next examine the correlation of the asserted defense with the informant's probable testimony. The burden is on the appellants to "show that the informant's testimony would significantly aid in establishing an asserted defense." *Tenorio–Angel,* 756 F.2d at 1511 (citing *Diaz,* 655 F.2d at 588). Mere conjecture about the possible relevance of Velez's testimony is insufficient to compel disclosure. *United States v. Kerris,* 748 F.2d 610, 614 (11th Cir.1984). Rendon contends that Velez's testimony is necessary to attack the accuracy of the voice attributions in the transcript of the August 2, 1988, meeting between Thompson, Rodriguez, Velez, Oria, and Rendon. On two occasions, the magistrate judge found that Rendon made no showing that Velez's testimony would be exculpatory or different from that of Thompson's. The district court implicitly adopted this finding and ruling. Nothing in the record indicates that the district court was clearly erroneous.

Jose Palma contends that Velez's testimony is necessary because only Velez could refute the government witnesses' testimony. The government contends that the notion that Velez would contradict overwhelming evidence of the brothers' participation in the importation conspiracy is mere speculation. As opposed to Rendon's defense, because none of Jose Palma's statements were tape-recorded, the issue of erroneous voice attributions does not arise with respect to Jose Palma's defense. The magistrate judge found that Jose Palma presented no evidence that Velez's testimony would contradict that of the government agents. The district court also implicitly adopted this finding. Upon examination of the record, we find no evidence forwarded by Rendon or Jose Palma that shows that Velez's testimony would significantly aid in establishing an asserted defense.

■■ The last factor to consider is the government's interest in nondisclosure. The government may establish such an interest by showing that disclosure could endanger the informant or other investigations. *Tenorio–Angel,* 756 F.2d at 1509. In this case, the government made an *ex parte, in camera* submission to the magistrate judge and the district court. The district court concluded that though no direct threats had been made by Jose Palma against any government informant, the matters set forth in the government's affidavit indicated that threats had been made by and on behalf of other appellants in this case.

As to this last factor, we are unable to completely review the district court's finding. The appellants failed to include in the record on appeal the sealed *in camera* affidavits submitted to the magistrate judge and the district court. Consequently, we are limited in reviewing this issue to the representations made in the briefs and the district court's statements in open court. It is elementary that appellants must perfect the record so as to support the issues which they present on appeal. On the record before us, we hold that the appellants have failed to show that the district court abused its discretion in denying the appellants' motions to compel the government to disclose Velez's true identity.

■■■ The question whether the government made reasonable efforts to locate Velez is one of fact, and we will sustain the district court's finding unless it is clearly erroneous. *See United States v. Hurtado,* 779 F.2d 1467, 1472 (11th Cir. 1985). Prior to trial, the magistrate judge on three occasions ruled that the government did not need to produce or identify Velez. Because the government began looking for Velez as soon as the district court indicated that it might order that Velez be produced, and the government continued the above-described efforts once

the district court did order that Velez be produced, the district court did not err in finding that the government made reasonable efforts to locate Velez. We also note that the defendants' sixth amendment right to compulsory process of witnesses is not violated when the government makes reasonable efforts in response to a court order to produce a witness but cannot locate the witness. *United States v. Brito*, 721 F.2d 743, 748–49 (11th Cir.1983).

### III. Motion for Severance

■ Severance is compelled if joint defendants' defenses are antagonistic and mutually exclusive. *United States v. Berkowitz*, 662 F.2d 1127, 1133 (5th Cir. Unit B 1981). We review a district court's denial of a severance motion for an abuse of discretion. *United States v. Gonzalez*, 804 F.2d 691, 694 (11th Cir.1986).

■ Jose Palma called Lara as a witness to testify that Manuel Palma was Lara's 50/50 partner during the negotiations in May, 1988; therefore, Jose Palma could not have been involved in the transaction. Manuel Palma contends that Lara's testimony eliminated Manuel Palma's ability to receive a fair trial, and that the district court erred in denying his motion for severance.

A review of Manuel Palma's closing argument reveals that Manuel Palma relied heavily upon Lara's testimony in support of his defense, and therefore no antagonism warrants severance. Manuel Palma's defense was that though he was involved in meetings with Lara and others to discuss a cocaine importation in May, 1988, those importation plans never came to fruition. Thus, Jose Palma's defense that Jose was not involved in the conspiracy does not conflict with Manuel Palma's defense that Manuel was not part of the 673–kilogram deal. Moreover, Manuel Palma has not contended that his reliance on Lara's testimony had to be developed at the last minute. We conclude that the district court did not abuse its discretion in denying Manuel Palma's motion for severance.

### IV. Roque's Sentencing Determination

■ The jury convicted Roque of conspiracy to possess with intent to distribute five kilograms or more of cocaine. The district court determined that under the Sentencing Guidelines, Roque's base offense level was thirty-six. A base offense level of thirty-six is warranted when fifty or more kilograms of cocaine are involved. U.S.S.G. § 2D1.1 (Nov. 1, 1990). According to the Guidelines, the district court can impose Roque's sentence only on the basis of Roque's conduct or the conduct of coconspirators in furtherance of the conspiracy that was known to Roque or was reasonably foreseeable. U.S.S.G. § 2D1.4, n. 1 (Nov. 1, 1990). Roque contends that neither his conduct nor the reasonably foreseeable conduct of his coconspirators justifies a conclusion that Roque knew that the transaction involved fifty or more kilograms of cocaine.

■ To facilitate judicial review of sentencing decisions and avoid unnecessary remands, sentencing courts should make explicit findings of fact and conclusions of law. *United States v. Wise*, 881 F.2d 970, 973 (11th Cir.1989). At Roque's sentencing hearing, the district court stated:

> There is no direct evidence, nor for that matter, any circumstantial evidence in this case that would allow me to draw any inference that Mr. Roque knew that there was more than fifty kilograms of cocaine involved.

> Now, with making that finding, I am still finding that the base offense level is 36. And I don't know how I could otherwise structure the possibility of your appealing on that point then by saying that.

Indeed, the district court structured well Roque's appeal. Because the district court failed to resolve the factual question by not making an explicit finding of the amount of cocaine in the conspiracy known or reasonably foreseeable to Roque, we vacate Roque's sentence and remand to allow the district court to make the appropriate factual finding.

CONCLUSION

In light of the reasons stated above, we affirm Gutierrez's, Palacio's, Jose Palma's, Manual Palma's, and Rendon's convictions and sentences. We also affirm Roque's conviction, but remand his case for a sentencing hearing to make findings of fact regarding the amount of cocaine involved in the conspiracy attributable to Roque, and resentencing.

AFFIRMED IN PART AND REMANDED FOR RESENTENCING.