[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 12, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-10891

_____

D. C. Docket No. 04-60072-CR-KAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GREGORY ATKINSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(December 12, 2006)**

Before TJOFLAT, HULL and BOWMAN,* Circuit Judges.

HULL, Circuit Judge:

---

*Honorable Pasco Bowman, II, United States Circuit Judge for the Eighth Circuit, sitting by designation.

Gregory Atkinson appeals his convictions and sentence for his role in a cocaine trafficking and money laundering conspiracy. After review and oral argument, we affirm.

## I. BACKGROUND

In September 2004, Atkinson was charged in a four-count indictment with: (1) conspiracy to possess with intent to distribute at least 150 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846; (2) possession with intent to distribute at least 15 kilograms of cocaine on February 20, 2004, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); (3) conspiracy to launder money with the intent to promote and conceal unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), and (h); and (4) engaging in a monetary transaction in criminally derived property of a value of $10,000 or more, in violation of 18 U.S.C. § 1957(a).[1] Atkinson pled not guilty and proceeded to trial.

The jury convicted Atkinson on all four counts of the indictment. At sentencing, the district court adopted the Presentence Investigation Report ("PSI") prepared by the probation officer. Atkinson's base offense level was 38, based on a drug quantity of 150 kilograms or more of cocaine as found by the jury. See

---

[1]The September 2004 indictment was actually the second superseding indictment. For the sake of simplicity, we refer to the second superseding indictment throughout this opinion as the "indictment."

U.S.S.G. § 2D1.1(c)(1). The district court applied a 2-level enhancement, pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because Atkinson was convicted of money laundering under 18 U.S.C. § 1956. The district court also applied a 4-level aggravating role enhancement, pursuant to U.S.S.G. § 3B1.1(a), for Atkinson's leadership role in the conspiracy. Atkinson's adjusted offense level was 44, which was then reduced to 43, pursuant to U.S.S.G. ch. 5, pt. A, cmt. n.2. With a total offense level of 43 and a criminal history category of I, Atkinson's advisory guidelines imprisonment sentence was life. The district court sentenced Atkinson to 480 months' imprisonment, a sentence below the advisory guidelines range.

Atkinson appeals, arguing: (1) there was insufficient evidence of his guilt as to Counts 1-3 of the indictment; (2) the district court erred in denying Atkinson's motion to compel disclosure of the confidential source that tipped the government to his cocaine activity; (3) the district court erred in denying Atkinson's motion to suppress and in denying him a Franks[2] hearing regarding the affidavit filed in support of the search warrant for Atkinson's storage unit; (4) the district court committed Booker[3] error at sentencing by applying the 4-level aggravating role enhancement under U.S.S.G. § 3B1.1(a); and (5) Atkinson's sentence should be

---

[2]See Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978).

[3]See United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005).

3

reversed because the district judge was biased against him and erroneously failed to recuse. After review and oral argument, we conclude that each of Atkinson's arguments lacks merit, and we affirm his convictions and sentence. Only the first two issues warrant additional discussion.

## II. DISCUSSION

### A.    Sufficiency of the Evidence

Atkinson challenges the sufficiency of the evidence with regard to Counts 1-3 of the indictment. Accordingly, we first recount the trial evidence and then address the sufficiency of the evidence as to each Count.[4]

On February 20, 2004, authorities received a confidential tip that Atkinson would, on that day, be transporting a large quantity of cocaine from 7701-6 South Aragon Boulevard, in Sunrise, Florida, to a location outside of Broward County, Florida. The informant stated that Atkinson would be transporting the cocaine in a vehicle rented from the Dollar Rent-A-Car at the Fort Lauderdale Airport.

A subpoena revealed that on the previous day, February 19, 2004, Atkinson had rented a silver Dodge Durango from the Dollar Rent-A-Car at the Fort

---

[4]We review a defendant's challenge to the sufficiency of the evidence de novo, taking all reasonable inferences in the government's favor. See United States v. Rudisill, 187 F.3d 1260, 1267 (11th Cir. 1999). We observe that Atkinson does not challenge the sufficiency of the evidence against him on Count 4 of the indictment (the second money laundering charge), and accordingly, we do not discuss that Count.

4

Lauderdale Airport. Atkinson's address on the Dollar Rent-A-Car application was listed as 7701-6 South Aragon Boulevard, in Sunrise, Florida.

Law enforcement officers initiated surveillance of Atkinson's residence at South Aragon Boulevard, and that afternoon, they observed a man (later identified as Winston Robinson) arrive at Atkinson's home in a BMW. Shortly thereafter, Atkinson arrived, driving the rented Durango. Atkinson entered his residence for a few minutes; returned to the Durango and retrieved a duffel bag; and reentered his residence. Atkinson and Robinson were then observed lifting a large, white object from Atkinson's garage and loading it into the back of the Durango. They then left Atkinson's residence in their respective vehicles.

Authorities followed Atkinson and Robinson a short distance to a gated rental storage facility known as Handy Storage. After Atkinson typed in a security code, he and Robinson drove into the complex. They proceeded to storage unit 407, which had a common garage door providing access to nine separate units inside. Records from Handy Storage revealed that Atkinson was the renter of unit 407-I, one of those nine units. Agents could not see what Atkinson and Robinson were doing at unit 407, and Atkinson and Robinson departed Handy Storage in their respective vehicles after six minutes. They drove to the Dollar Rent-A-Car facility and returned the Durango, and Robinson then drove Atkinson home and

departed.

At the Dollar Rent-A-Car, a narcotics dog inspected the Durango and alerted to the back of the car.  However, no drugs were found in the car.  The dog's handler testified at trial that the alert meant that narcotics had recently been present in the Durango.  The narcotics dog was then taken to Handy Storage, where he alerted to unit 407-I (Atkinson's unit), but not to the other storage units.

Agents then obtained a warrant to search Atkinson's storage unit.  Detective Christopher Hickox of the Broward Sheriff's Office swore out an affidavit in support of the application for the search warrant, in which he detailed essentially the same facts as above.

Upon execution of the search warrant, officers found a number of items in Atkinson's storage unit, including six cases of Nestle Supligen, a popular Jamaican beverage; rolls of plastic wrap and packing tape; and a large, unattached sink.  The narcotics dog alerted to the Supligen cases.  Two cans of Supligen were opened and field-tested negative for cocaine; however, a third can field-tested positive for cocaine.  Lab analysis ultimately revealed that 92 of the 288 cans of Supligen in the storage unit (there were 48 cans per case) contained liquid cocaine.  Agents later determined that the cans containing liquid cocaine did not have expiration dates on the bottom, whereas the cans containing real Supligen did.  The total

amount of cocaine confiscated from the Supligen found in unit 407-I was 38.66 kilograms.

The surveillance team at Atkinson's residence then arrested Atkinson based on the cocaine found in his storage unit. Atkinson consented to a search of his residence, and agents seized bank documents, Atkinson's Jamaican passport, and an airline ticket indicating that Atkinson had left Jamaica on February 10, 2004, and was to return on February 24, 2004. The agents also found a certificate from the State of Florida administratively dissolving a business called "Go-Racing International" for failure to file an annual report.

Continued investigation led to the arrests of Atkinson's co-defendants, Richard Hinds and Cecil Rose, at their residences in Bridgeport, Connecticut. Hinds and Rose are cousins. Rose ultimately testified against Atkinson at trial.

Testimony from Rose and other witnesses established that Atkinson received cocaine-laden Supligen shipments from Jamaica on a regular basis, using the names and social security numbers of friends and acquaintances (Atkinson did not have a social security number). Typically, Atkinson would retrieve the Supligen shipments after they cleared Customs in Florida and then drive the shipments to Bridgeport, Connecticut in a rental vehicle. While driving and upon arriving in Bridgeport, Atkinson would contact Rose and Hinds by cellular telephone.

7

According to Rose, upon Atkinson's arrival in Bridgeport, Atkinson would usually stay at a hotel or at Hinds's house for a night or two, and generally, Atkinson would bring nothing more than the Supligen and an overnight bag. After receiving a phone call that his buyers were ready with the money, Atkinson would deliver the Supligen to Hartford, Connecticut in his rental vehicle.

Rose testified that when Atkinson would come to Bridgeport, Atkinson would typically bring five to six boxes of Supligen with him, and Rose would often assist Atkinson and Hinds in unloading the Supligen boxes from Atkinson's rental car into Hinds's house. Once inside, Atkinson, Rose, and Hinds would inspect the cans to determine which held cocaine and which were regular drinks. Atkinson explained to Rose that the cans with numbers on the bottom contained regular Supligen, while the cans that did not have numbers contained liquid cocaine. Atkinson, Rose, and Hinds would remove the cans containing cocaine as well as a few legitimate cans, and they would condense those cans into one or two cases for later delivery to Hartford. The remainder of the legitimate cans were left at Hinds's house, where Atkinson, Rose, and Hinds would usually drink them.

Rose testified that he accompanied Atkinson to Hartford three times, and that on two of those trips, Hinds came as well. They delivered the cans to a house in Hartford that contained only a couch, a machine for counting large quantities of

8

money, and three people whom Rose did not know. These individuals paid Atkinson for the Supligen. Rose testified that each time he went to Hartford, they delivered approximately seventeen cans of cocaine-laden Supligen. The money for the Supligen was provided to Atkinson in zip lock bags, and each bag contained approximately $20,000, although the person who bought the cocaine once said, in front of Rose, that he paid around $18,000 per can.[5] On Rose's trips to Hartford, defendants immediately returned to Bridgeport with the money.

On other occasions, Rose observed Atkinson and Hinds leave for Hartford with Supligen cans and return with money. Each can of liquid cocaine was worth approximately $18,000; a can of regular Supligen costs about $3. On the last trip to Hartford, in late 2003, Atkinson, Rose, and Hinds received approximately $200,000.

Neither the authorized Supligen dealer for the United States nor any registered Nestle customer in Jamaica was shipping the Supligen to Atkinson. The address of the shipping party in Jamaica corresponded to "Lynford Dillen"; however, Nestle had no customer by that name, and Atkinson's name also did not appear in Nestle's customer database. Moreover, the seized Supligen cans were not marked for United States distribution, and the distribution manager for Nestle

---

[5]Rose also testified that he had previously purchased regular Supligen in stores, and it cost approximately $3 per can.

in Jamaica testified that no legitimate Supligen cans would have left the factory without an expiration date on the bottom.

Rose testified that someone named Murphy in Jamaica was "the boss" of the cocaine operation. According to Rose, Hinds once called him from Jamaica and instructed him to retrieve $10,000 from Hinds's house, buy a plane ticket to Jamaica with $1000, and deliver the remaining $9000 to Hinds. Rose testified that he retrieved the money from underneath Hinds's bed, and it was packaged in the same way as was the money that defendants had received in Hartford. Rose went to Jamaica, delivered the $9000 to Hinds, and watched Hinds give the money to Murphy. Rose also testified that after Atkinson's arrest, Murphy called Hinds to tell him about the arrest, and Hinds had Rose wire money to a bail bondsman on Atkinson's behalf.

Rose further testified that before Atkinson would return to Florida from Connecticut, Atkinson and his co-defendants would purchase money orders from various post offices in Connecticut in small increments. Defendants bought the money orders in increments less than $3000, in order to avoid having the sales documented. Rose personally participated in four or five money-order buys. On each trip to purchase money orders, defendants visited multiple post offices so that they could buy more money orders. The money orders were paid for with the

10

money from the sales in Hartford, although not all of the drug money was used to buy money orders—Atkinson took some of the cash with him, and left some behind for Hinds. Atkinson would leave town an hour or two after defendants purchased the money orders.

In September 2003, United States Postal Inspectors in Connecticut realized that certain individuals were buying money orders in small increments on Atkinson's behalf. Inspectors tracked the purchase of eighty-two separate $1000 money orders that were both "to" and "from" Atkinson: $6000 on August 15, 2003; $26,000 on September 29, 2003; $8,000 on October 14, 2003; and $42,000 on November 5, 2003. The money orders were deposited into Atkinson's personal bank accounts in Florida. Rose was seen purchasing several of the money orders, and on one occasion, Rose was observed leaving a post office and getting into a vehicle with a Florida license plate. The Florida license plate corresponded to a car that had been rented by Atkinson three days earlier at a Dollar Rent-A-Car in Florida.

### 1. Count 1: Conspiracy to Possess with Intent to Distribute

The jury convicted Atkinson of Count 1, finding that he conspired to possess with the intent to distribute at least 150 kilograms of cocaine.[6] On appeal,

---

[6]The jury first concluded that Atkinson conspired to possess with the intent to distribute cocaine. Then, the jury found that Atkinson conspired to possess with the intent to distribute

11

Atkinson argues that the government failed to prove that he conspired to possess with the intent to distribute anything more than the 38 kilograms of cocaine found in his storage unit. Atkinson also contends that even as to the 38 kilograms, the government failed to prove that he conspired with Hinds to distribute those kilograms.

In order to sustain Atkinson's conviction under Count 1, we must find that the government offered sufficient evidence to prove beyond a reasonable doubt that: (1) an agreement existed to possess with the intent to distribute cocaine; (2) Atkinson knew of the agreement; and (3) Atkinson knowingly and voluntarily joined the agreement. United States v. Charles, 313 F.3d 1278, 1284 (11th Cir. 2002). Atkinson's participation in the conspiracy need not have been established by direct evidence. See United States v. Garcia, 405 F.3d 1260, 1270 (11th Cir. 2005). "'Indeed, because the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements.'" Id. (citation omitted).

First, we conclude that the government offered more than sufficient evidence to prove beyond a reasonable doubt that Atkinson conspired with Hinds to possess with the intent to distribute the 38 kilograms of cocaine found in Atkinson's

_____

cocaine weighing at least 150 kilograms.

12

storage unit.  The evidence, viewed in the light most favorable to the government, established that Atkinson imported liquid cocaine hidden in Supligen cans from Jamaica to Florida for resale in Connecticut over a multi-year period.  Atkinson used other people's names and social security numbers to import the Supligen to the United States, and even the legitimate Supligen imported by Atkinson was not intended for distribution in the United States.  More importantly, the cocaine-laden Supligen cans lacked an expiration date and did not even originate at the Nestle factory.

After the Supligen shipments arrived in Florida, Atkinson would rent a car and drive to Connecticut, where he would typically meet Rose and Hinds in Bridgeport.  Rose's testimony confirmed that Hinds was intimately involved in the scheme with Atkinson.  In addition to assisting Atkinson in separating the cocaine-laden Supligen from the real Supligen, Rose and Hinds accompanied Atkinson to Hartford to sell the cocaine on multiple occasions, and they assisted Atkinson in purchasing small-dollar money orders with the cocaine proceeds.  Atkinson, Rose, and Hinds separated the cocaine-laden Supligen from the real Supligen at Hinds's house, and Atkinson even stayed at Hinds's house on several occasions.

Atkinson's storage unit was found to contain six cases of Supligen, in which 38 kilograms of liquid cocaine were concealed.  The cocaine-laden Supligen found

in Atkinson's storage unit, just like the Supligen that Rose testified about, lacked expiration dates on the bottom of the cans. Additionally, on the day of his arrest, law enforcement officials watched Atkinson unload a large object from his house into a rental car, drive to his storage unit, and return the rental car—behavior consistent with Rose's testimony and the rest of the government's evidence as to the overall conspiracy. Accordingly, the government offered more than sufficient proof that Atkinson conspired with Hinds to possess with the intent to distribute the 38 kilograms of cocaine found in the storage unit.[7]

Moreover, we reject Atkinson's contention that there was "insufficient evidence" that he conspired to possess with the intent to distribute at least 150 kilograms or more of cocaine. In United States v. Hansley, 54 F.3d 709 (11th Cir. 1995), we held that because the record contained sufficient circumstantial and direct evidence to show that defendants' trips to purchase 272 grams of crack were "a reliable proxy for all of the other trips in the conspiracy," the overall drug

---

[7]Although Atkinson testified that he was a legitimate businessman who was taking advantage of a lucrative market for Supligen and also made a substantial amount of money through his car hobby shop, "Go Racing International," the jury was entitled to reject Atkinson's testimony. See United States v. Hasner, 340 F.3d 1261, 1272 (11th Cir. 2003). Moreover, we observe that much of Atkinson's testimony was directly contradicted by other evidence. For instance, Atkinson argues that he "demonstrated" that he purchased $32,000 in money orders in August 2003 from the sale of legitimate Supligen and miniature race cars; however, the government established (by comparing the cost per case with the sale price per case) that while Atkinson occasionally made a small profit by selling legitimate Supligen, he often lost between $4 and $8 per case.

quantity in the conspiracy could be calculated for sentencing purposes by multiplying 272 grams by the number of trips made. Hansley, 54 F.3d at 714 & nn. 4-5 (quotation marks, brackets, and citation omitted).

Here, Rose specifically testified that Atkinson, Rose, and Hinds typically sold seventeen cocaine-laden cans of Supligen when Atkinson came to Connecticut, and the jury was entitled to credit that testimony, consistent with Hansley. Rose was a key figure in the conspiracy, and while he did not always accompany Atkinson to Hartford, the evidence when viewed in the light most favorable to the government established that Rose was generally involved when Atkinson came to Connecticut, such that Rose could speak to the typical amount of cocaine brought to Connecticut by Atkinson. Moreover, the cocaine-laden Supligen found in Atkinson's storage unit contained approximately .41 kilograms of cocaine per can, and customs records and car rental receipts introduced by the government showed twenty-four separate instances in which Atkinson received Supligen shipments, drove to Connecticut, and returned to Florida. Thus, the jury's drug quantity determination of at least 150 kilograms was consistent with Hansley (.41 kilograms per can * 17 cans per trip * 24 trips = 167.28 kilograms).

Moreover, we believe 167.28 kilograms is a conservative estimate, based on the fact that there were approximately two cocaine-laden cases of cocaine found in

15

Atkinson's storage unit, and that those cases contained thirty-eight kilograms of cocaine. Rose also testified that Atkinson typically brought five to six cases of Supligen to Connecticut, and that defendants then reduced those cases to one or two cases that contained mostly cocaine. Thus, if we were to use the thirty-eight kilograms found in Atkinson's storage unit as a typical proxy, which the jury also could have done (consistent with Hansley and based on Rose's testimony), the requisite 150 kilogram-amount would obviously be present (38 * 24 = 912 kilograms). Thus, even taking the most conservative view of the evidence, the jury was entitled to attribute at least 150 kilograms of cocaine to Atkinson.

### 2. Count 2: Possession with Intent to Distribute

In order to obtain a conviction for possession with intent to distribute, the government must establish: "(1) knowledge (of one's possession); (2) possession of a controlled substance; and (3) intent to distribute that substance." United States v. Wilson, 183 F.3d 1291, 1298 n.13 (11th Cir. 1999). Atkinson contends that the government failed to adduce sufficient evidence to convict him of possession with intent to distribute. He relies on his testimony that he did not know that cocaine was in the Supligen cans in his storage unit, or even that cocaine could be transported in liquid form. Atkinson also relies on his testimony that another individual had access to the storage unit; that thirty cases of Supligen were missing

16

from the storage unit when Atkinson visited the storage unit on February 20, 2004; and that he was engaged in the legitimate sale of Supligen.

Atkinson's arguments are without merit. As discussed above, there was ample evidence that Atkinson imported cocaine from Jamaica to Florida in Supligen cans and redistributed the cocaine in Connecticut. Rose testified extensively as to Atkinson's cocaine trafficking activities. Moreover, on the day of his arrest, Atkinson was seen moving a large object from his house into his rental vehicle and then into his storage unit.[8] Shortly thereafter, a narcotics dog alerted to Atkinson's rental vehicle, as well as Atkinson's storage unit. Most importantly, police then found thirty-eight kilograms of cocaine in Atkinson's storage unit. The jury was entitled to reject Atkinson's alternative explanations, and accordingly, we affirm Atkinson's conviction as to Count 2.

### 3. Count 3: Money Laundering

Count 3 charged Atkinson and Hinds with conspiracy to launder money with the intent to "promote" unlawful activity, as well as conspiracy to launder money with the intent to "conceal" unlawful activity. In order to establish either a "promotion" offense or a "concealment" offense, the government had to prove that:

---

[8]While Atkinson contends that this object was a kitchen sink, and a kitchen sink was indeed found in the storage unit, there was law enforcement testimony that the sink "was dusty" and "appeared as if it had been there for a while."

17

(1) Atkinson conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily specified illegal activity; and (3) Atkinson knew the transaction involved the proceeds of illegal activity. See United States v. Magluta, 418 F.3d 1166, 1173 n.2 (11th Cir. 2005) (concealment); United States v. Carcione, 272 F.3d 1297, 1302 (11th Cir. 2001) (promotion). For the concealment offense, the government also had to establish that Atkinson knew that "a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds," see Magluta, 418 F.3d at 1173 n.2, and for the promotion offense, the government also had to establish that Atkinson conducted the transaction "'with the intent to promote the carrying on of the specified unlawful activity.'" Carcione, 272 F.3d at 1302 (citation and brackets omitted). Additionally, to establish conspiracy, the government had to prove that Atkinson had knowledge of the money laundering conspiracy and the intent to join or associate with the objective of the conspiracy. Id. at 1302 n.7.

We reject Atkinson's contention that the government presented insufficient evidence to sustain his money laundering conviction. Rose's testimony established that Atkinson—and Rose and Hinds, at Atkinson's direction—used the cocaine proceeds to purchase money orders in increments of less than $3000, in order to avoid reporting requirements, and the money orders were in Atkinson's name.

18

Atkinson relies on his own trial testimony in support of his claim that the government "failed to prove beyond a reasonable doubt" that the $42,000 in money orders that he purchased in November 2004 were from proceeds of his unlawful cocaine trafficking activity, but the jury was entitled to reject Atkinson's claim that the $42,000 in money orders resulted from his sale of Go Racing, International. See United States v. Hasner, 340 F.3d 1261, 1272 (11th Cir. 2003). Likewise, the jury was entitled to reject as incredible Atkinson's claim that the August and September 2003 money orders were purchased from the proceeds of legitimate Supligen sales and sales of miniature race cars, as well as Atkinson's claim that he never told Rose to buy a money order on his behalf.[9] See id.

Atkinson's claim that the government failed to establish either his "intent to promote" or "conceal" is similarly unavailing. As to concealment, there was substantial evidence that defendants discussed and agreed to intentionally structure the money order purchases in a manner designed to avoid reporting requirements and detection, and that the money orders were then deposited in Atkinson's bank account. See United States v. Majors, 196 F.3d 1206, 1213 & n.18 (11th Cir. 1999) (evidence that may be used to establish concealment includes structuring the transaction in a way designed to avoid attention and depositing illegal profits in the

_____

[9]We observe that on one occasion, Rose purchased money orders from a post office in Connecticut and was then seen getting into a car that had been rented by Atkinson.

bank account of a legitimate business). Moreover, Atkinson's continued drug

trafficking was dependent on conveying the impression that he was a legitimate

businessman. Taking all of the evidence in the light most favorable to the

government, Atkinson's purchase of the money orders with cash from his personal

cocaine sales was also designed to "promote" his underlying cocaine trafficking by

continuing to convey the impression that he was a successful entrepreneur.

Accordingly, we affirm Atkinson's conviction for money laundering.

## B.    Motion to Compel

Atkinson filed a pretrial motion to compel disclosure of the identity of the

Confidential Source ("CS") referred to in Officer Hickox's affidavit, filed in

support of the search warrant. On appeal, Atkinson contends that the district court

erred in denying his motion to compel disclosure of the CS. We reject Atkinson's

argument.[10]

Officer Hickox's affidavit in support of the warrant stated, in pertinent part:

On February 20th, 2004 Special Agent Jon DeLena (Drug
Enforcement Administration) received information from a source that
wished to remain anonymous.[11] The source stated that an individual
by the name of Gregory Atkinson would be transporting a large
amount of cocaine from 7701-6 S. Aragon Blvd, Sunrise, Florida to a

---

[10]A district court's denial of a motion to compel disclosure of a CS is reviewed for abuse of discretion. United States v. Gutierrez, 931 F.2d 1482, 1490 (11th Cir. 1991).

[11]The government states in its response brief that "[t]he source wished to remain anonymous, but the government was aware of the source's identity."

location outside of Broward County on the same date. The source further stated that Gregory Atkinson would be driving a vehicle rented from Dollar Rent-A-Car at Fort Lauderdale Airport.

The affidavit also detailed how police independently confirmed the CS's allegations, including: (1) a subpoena to Dollar Rent-A-Car that confirmed that Atkinson had rented the Dodge Durango on February 19, 2004; (2) surveillance conducted on Atkinson's house on February 20, 2004, during which police observed Atkinson and Winston Robinson load a large object from Atkinson's garage into the back of the Durango; (3) continued surveillance as Atkinson and Robinson drove the Durango and Robinson's BMW to Handy Storage and stayed for a short period; (4) continued surveillance as Atkinson then returned the Durango to Dollar Rent-A-Car; (5) the narcotics dog's subsequent alert to the exterior of the Durango; (6) a subpoena to Handy Storage that revealed that Atkinson was the sole lessor of unit 407-I; and (7) the narcotics dog's subsequent alert to the exterior door of unit 407-I.

Atkinson relies on Roviaro v. United States, 353 U.S. 53, 77 S. Ct. 623 (1957), in support of his claim that the government should have been ordered to disclose the identity of the CS. In Roviaro, the Supreme Court recognized that the government has the privilege to withhold from disclosure the identity of its informants, but the privilege is limited. Roviaro, 353 U.S. at 59-60, 77 S. Ct. at

21

627. The <u>Roviaro</u> Court established a balancing test, whereby a court must examine "the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." <u>Id.</u> at 62, 77 S. Ct. at 629. If disclosure is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." <u>Id.</u> at 60-61, 77 S. Ct. at 628.

A review of the facts of this case shows that, under <u>Roviaro</u> and its progeny, Atkinson had no right to disclosure of the CS's identity. Atkinson has not met his burden of showing that the CS was anything more than a "tipster" or that the CS somehow participated in the charged offenses. Atkinson also proffers nothing more than speculation as to how disclosure of the CS's identity might have aided his defense. Accordingly, the district court did not abuse its discretion in denying Atkinson's motion to compel disclosure of the CS. <u>See</u> <u>United States v. Mendoza</u>, 433 F.2d 891, 893-94 (5th Cir. 1970)[12] (where the search warrant that led to defendant's arrest was secured on the basis of a confidential informant's information, and there was no evidence that the informant "participated in any way in the offense charged," <u>Roviaro</u> did not require disclosure of informant's identity);

_____

[12]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (<u>en banc</u>), this Court adopted as binding precedent all Fifth Circuit decisions rendered prior to October 1, 1981.

22

see also United States v. McDonald, 935 F.2d 1212, 1217 (11th Cir. 1991) (holding that if defendant can establish that informant played a prominent role in the underlying criminal activity, or show, beyond mere conjecture, that informant's probable testimony would bear a direct relationship on an asserted defense, defendant may be entitled to informant's identity); United States v. Diaz, 655 F.2d 580, 587 (5th Cir. Unit B Sept. 1981) (noting that Roviaro does not require disclosure of mere tipsters' identities).

Indeed, we observe that the CS's information was not even essential to establishing probable cause for the search warrant, as there was ample evidence apart from the CS's tip that supported the warrant, including the drug dog's alert to the very storage unit that officers sought to search.[13] Cf. Roviaro, 353 U.S. at 61, 77 S. Ct. at 628 (observing that in cases where informant's communications led to a warrantless search, the government has been required to disclose informant's identity unless there is sufficient evidence of probable cause apart from the informant's confidential communications). Accordingly, we reject Atkinson's claim that he was entitled to know the CS's identity.

### III. CONCLUSION

For the foregoing reasons, we affirm Atkinson's convictions and sentence.

**AFFIRMED.**

---

[13]For this reason, we find unavailing Atkinson's contention that he was precluded from properly cross-examining Officer Hickox as to the probable cause affidavit.