[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13438
_____

D.C. Docket No. 1:16-cr-20700-FAM-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOSE PINEDA CASTRO,
ANIBAL MUSTELIER,
YAMILE DIAZ BERNAL,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(November 7, 2019)

Before ROSENBAUM, GRANT, and HULL, Circuit Judges.

PER CURIAM:

After a trial, a jury found appellants Jose Pineda Castro ("Pineda"), Anibal Mustelier, and Yamile Diaz Bernal ("Diaz") guilty of a variety of crimes related to two jewelry-store robberies and one attempted jewelry-store robbery. Among other evidence, the government presented recorded conversations between Pineda, Diaz, and a confidential informant in which Pineda described his distinctive method of breaking into jewelry stores. The jury also heard testimony that police found some of the stolen jewelry, as well as burglars' tools, in Mustelier's house.

Defendants raise a variety of issues on appeal and adopt each others' arguments where applicable. We break down which defendants challenge which aspects of the proceedings in the district court: Mustelier argues that the district court should have granted his motion to suppress the evidence found in his home; he also challenges the sufficiency of the evidence of his guilt. For her part, Diaz contends that the court should have ordered the Government to reveal the identity of a nontestifying confidential informant. As for Pineda, he argues that the district court improperly admitted evidence of his prior bad acts, that the Government violated his right to due process when it lost a receipt he says would have been exculpatory, and that the court should have granted his motion for a mistrial because he walked to the witness stand while wearing ankle restraints. Besides these claims applicable to only one defendant, Mustelier and Diaz assert that the district court's jury-selection procedure was an abuse of discretion and that the court's conduct during trial in the

2

presence of the jury violated their right to a fair trial.  Finally, all three defendants argue that their sentences are unreasonable.

After careful review and with the benefit of oral argument, we affirm defendants' convictions.  We also affirm defendants' sentences, except that we vacate Mustelier's sentence for being a felon in possession of a firearm, which is illegally high, and remand his case to the district court for him to be resentenced on that count.[1]

## I.    Background

On December 6, 2016, the grand jury returned a superseding indictment against defendants, charging them with a variety of robbery-related crimes.  The indictment alleged that Mustelier and Pineda robbed the Luany Jewelry Store on May 30, 2015, and charged them with Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).  Next, it alleged that Mustelier and Pineda robbed the Ariel Jewelry Store on September 3, 2015, and charged them with Hobbs Act robbery and brandishing a firearm in furtherance of that crime.  The indictment further asserted that Mustelier, Pineda, and Diaz attempted to rob the Real Deal Jewelry Store on August 8, 2016, and charged them with attempting to commit a Hobbs Act robbery.  In addition, the indictment charged each defendant with conspiring to

---

[1] Diaz argues that she was denied a fair trial under the cumulative-error doctrine.  Since we do not perceive any error as it relates to her, we necessarily also find that Diaz was not denied a fair trial under that doctrine.

3

commit Hobbs Act robberies, in violation of 18 U.S.C. § 1951(a). Finally, the indictment charged Mustelier with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).

A. Mustelier's Suppression Motion

During the course of the investigation, law enforcement responded to Mustelier's residence. While there, Sergeant Barbaro Hernandez of the Hialeah Police Department observed burglars' tools inside the house. Based on this information and other evidence, law enforcement sought and obtained a search warrant. Mustelier moved to suppress evidence found in his house during the execution of a search warrant.

A magistrate judge held a hearing on Mustelier's motion. During the hearing, Hernandez testified that he knocked on the front door of the house, and a woman named Lima answered. Lima was Mustelier's girlfriend and the owner of the home. Eventually, Mustelier came to the door without a shirt on. Hernandez testified that Mustelier requested that Lima get him a shirt, so Hernandez asked Lima, "for safety reasons, can I go with you, please?" According to Hernandez, Lima then replied, "Yes, no problem." Hernandez followed Lima to Mustelier's bedroom, and, he said, from the doorway of the bedroom, Hernandez observed burglars' tools inside Mustelier's room.

The Government also called Detective Michael Ramos, who was right behind Hernandez when Hernandez knocked on the front door. Ramos testified that Mustelier, without a shirt on, opened the door and that Lima joined him moments later. According to Ramos, Hernandez asked Lima whether he could get Mustelier a shirt, and Lima "agreed" by saying, "come get the shirt."

The defense called Lima to testify. Lima said that Mustelier answered the door and that the officers asked him to talk to them outside. Mustelier was not wearing a shirt, so Lima got him one from his room. When she returned, she said, she discovered that officers were already inside Lima and Mustelier's living room. Then, she testified, Mustelier told her to contact an attorney and to not let the officers in the house without a warrant. Lima attested that the officers left with Mustelier but that, 15 minutes later, officers knocked on her door again and searched Mustelier's room without her permission, claiming that "the warrant is on the way." On cross-examination, Lima said that Mustelier was the "best thing that ever happened" to her and that he was her "everything."

The defense also called Maria Garcia, Lima's mother, to testify. Garcia said that she saw officers talk to Lima and that she had been the person who suggested that Lima get Mustelier a shirt. She conceded that she did not personally see officers search the house.

5

In addition, the defense called Yolanda Quintero, who lived in an apartment attached to Lima's home. She testified that Lima was not accompanied by an officer when she retrieved a shirt for Mustelier and that later, when officers returned, Lima had asked them "straight-away" whether they had a warrant, to which they replied that a warrant was forthcoming.

The magistrate judge recommended that the district court deny Mustelier's motion. He found that "the police officer's testimony was credible when he testified that he asked if he could come in with her to retrieve the shirt." The magistrate judge reasoned that it "ma[de] sense that he wouldn't want her to go into the home without somebody watching her because of the danger that she could come out with a weapon or with someone else that was dangerous." In addition, he found that the officers' testimony was "credible and believable" and that "the consent was proper consent under the law, that it was not coerced." The magistrate judge did not credit Lima's testimony since she "ha[d] a substantial reason to help" Mustelier because of their "long relationship" and because of how he faced a "considerable amount of time in jail if . . . convicted in this matter." For the same reasons, the magistrate judge did not find Lima's mother's testimony credible.

Mustelier filed objections to the magistrate judge's report and recommendation. He argued that the magistrate judge should not have credited the Government witnesses' testimony because, while the defense witnesses had a relationship with

Mustelier, the Government witnesses had a parallel motive to fabricate their accounts:  covering up an unlawful entry into the home.

The district court overruled Mustelier's objections and adopted the magistrate judge's recommendation.  The case subsequently proceeded to trial.

### B.  The Court's Jury Selection Procedure

At the outset of jury selection, the court informed the parties that the Government had six peremptory challenges and the defense had ten.  The court instructed the parties to announce their decisions as to each individual juror in this order:  first, the Government, then counsel for Mustelier, then counsel for Pineda, and finally counsel for Diaz.  In the course of jury selection, the lawyers for defendants consulted with each other on the defendants' side of the courtroom.  Counsel for Diaz later asked the court to clarify how many peremptory challenges the defense had in total.  The court reiterated that the defense collectively had ten peremptory challenges, based on what "the rules sa[id]."  The judge further suggested the defense "be frugal" with their peremptory challenges.  Counsel for Diaz asked that the defense lawyers be permitted to consult with each other in private (apparently meaning outside the courtroom or in the courtroom when no one else was present) and, after the defense exhausted their peremptory challenges, requested additional peremptory challenges.  The court refused both requests.  The Evidence at Trial

### i. The Jewelry-store Robberies

On the morning of August 8, 2016, the employees of Luany Jewelers heard a "very loud sound" and then saw men come through the wall between the jewelry store and an adjacent retail space. They were dressed in black and wore masks covering their faces. The men threw the employees to the ground before asking one of the employees to lead them to the store's safes and open them. One of the employees saw that one of the men had a red tattoo that went from his lower back to his neck, which she saw through openings in his clothing. Another one of the men was a "somewhat older person," which the employee knew because she could see wrinkles around his eyes.

Police later found that the men had cut the deadbolt of the door to the adjacent retail space and had made a hole in the shared wall between that space and jewelry store. The men had taken the store's security recordings and left their power tools behind. The owner of Luany Jewelers estimated that he had lost between $250,000 and $500,000 worth of property in the robbery.

On the morning of September 3, 2015, the employees of Ariel's Jewelry were preparing for work when the wall between the store and the adjacent retail space "[j]ust collapsed." Men in construction boots came through the hole and pinned them to the ground. Then, the men handcuffed the employees and asked the employees where the safes and surveillance equipment were. The men took the store's

8

inventory away in duffel bags.  Law enforcement found that the store's security recordings were missing and that the men had left their power tools behind.

On the morning of August 8, 2016, the owner of Real Deal Jewelry was preparing for work at his store when he heard something hit the wall from the direction of an adjacent retail space.  He looked at his security-camera video and saw three men in the back alley of the shopping center holding bags.  He called the police and left the store.  Three different employees of Real Deal Jewelry later each separately identified Diaz as someone who had visited the store prior to that date.

### ii.  The Recorded Motel Meetings

Janet Hernandez, a confidential informant, told law enforcement that she was aware of the August 8, 2016, attempted robbery and worked with the Hialeah Police Department to set up meetings with Pineda.  The meetings took place in a motel room on August 12, 13, and 14, 2016, and law enforcement arranged for surveillance equipment to record the conversations in the room.  Janet[2] attended the meetings with her acquaintance "Eddie," who was also a confidential informant.  Pineda's wife, Diaz, was present for much of the time as well.

The jury heard the audio recordings of the motel meetings.  During the August 12 meeting, Pineda told Janet that he could get her two SIG Sauer pistols and

---

[2] To avoid confusion with Sergeant Barbaro Hernandez, whom we have previously discussed and discuss further later in this opinion, we refer to Janet Hernandez as "Janet."

9

bragged that the media had referred to him as a "magician" for being able to rob stores that others could not rob. He told Janet that he targeted jewelry stores because most of the employees were women and because they were never armed. He showed off some of his equipment, including gun holsters, ski masks, and handcuffs, and described to her how the August 8 burglary had gone wrong. Pineda told Janet that his team included his wife, who was Diaz; a person he referred to as "the cousin"; and a person he referred to as "old man." Pineda said that the "old man" was his mistress Karina's father. And Pineda's mother told the jury Pineda's mistress was Karina Mustelier, defendant Mustelier's daughter.

During the August 13 meeting, Janet, Pineda, and Diaz discussed guns and bullet-proof vests. Pineda said that the SIG Sauers that he had mentioned were available and that their serial numbers had been erased. While discussing bullet-proof vests, Diaz researched types of vests on her phone. Pineda described Diaz's role to Janet. Diaz was "good with all of it" except the robbery itself, Pineda said, so she would go to the stores in advance with the couple's daughters to scope out the security system and employees at the store. Diaz told Janet that she was "there for [Pineda] whenever he need[ed]" her. Apparently to gain Janet's trust, Diaz offered to "bring" Janet her daughters, which Janet understood to mean that Janet would thereby have leverage over Pineda and Diaz if they were to go back on any agreement they might have.

During the August 14 meeting, Pineda told Janet that he planned to "rob security officers" to acquire guns for her, and Janet told him not to do that. Instead, Janet asked for the SIG Sauer pistols that Pineda had said were available. Pineda told her he would have to go get them, decide on a price, and bring the "old man" so that Janet could meet him.

During this meeting, Detective Yerani Mirabal of the Hialeah Police Department was working surveillance. When Pineda left the motel, Mirabal followed him to 256 East 21st Street. Pineda knocked on the front door of the house, and Mustelier answered. They talked, went to a parked car, and removed a black bag from its trunk. The two looked inside the bag and shook hands before Pineda left.

Officers arrested Pineda later that night. Post-arrest photos revealed that on his back, he had a large, "predominantly orange" tattoo depicting a tiger. Officers arrested Mustelier at his home.

### iii.  The Search of Mustelier's House and Pineda's Car

As we previously noted, officers executed a search warrant on the home where Mustelier lived. In Mustelier's room, they found two nine-millimeter SIG Sauer semi-automatic handguns that had their serial numbers erased. They also found five pairs of handcuffs; a diamond tester; a gold, silver, and platinum testing kit; a machine used to detect fake money; a "radio frequency bug detector"; a "stone magnifying glass"; and a "stone measuring tool." In another bedroom of the house, they

11

discovered "a lot of jewelry" inside various containers. In several sheds on the property, they located construction equipment and a duffel bag with a handcuff key inside of it. In total, law enforcement found over 400 pieces of jewelry inside the house. Jewelry-store employees identified some of the jewelry pictured in Government Exhibits 38A-H, 66, 67, and 68 as jewelry from Ariel's Jewelry and Luany Jewelers.

Officers also searched Diaz's car, which Pineda primarily used, and found two-way radios, power tools, and holsters for handcuffs and guns.

### C. Pineda's Restraints During Trial

During trial, Pineda wore ankle restraints. Defendants and their lawyers sat directly across from the jury at an L-shaped table with a skirt that shielded Pineda's ankle restraints from the jury's view. After Pineda testified in his own defense, counsel for Diaz moved for a mistrial because Pineda had walked to the stand while still in ankle restraints. Counsel for Pineda joined the motion, adding that the jury must have noticed the ankle restraints. Counsel for Pinea explained that she had not raised the objection at the time because she did not "want to make a bigger ado about it."

To resolve the matter, the court took pictures of the courtroom from the perspective of the jury. After reviewing those photos and the courtroom, the district judge made a factual finding that the path between counsel's table and the stand was covered except for a "little gap" between the witness stand and where an interpreter

usually sat, but that the additional interpreter had been in the gap blocking the jury's view. So counsel for Pineda argued that the jury might also have heard the sounds of Pineda's ankle restraints.

At the conclusion of the Government's case, counsel for Pineda renewed her motion for a mistrial based on Pineda's restraints. Addressing the argument that the jury might have heard the sound of the ankle restraints, the court asked the court reporter to play the audio from when Pineda walked from counsel's table to the witness stand. After the court reporter played the audio, the court said, "I will tell you that I did hear it at the beginning when it actually occurred slightly. I didn't hear it this time when I'm really trying to listen, for whatever it's worth," and denied counsel's motion for a mistrial. The audio recording is not a part of the record on review.

### D. The Verdicts

The jury found Pineda and Mustelier guilty on all of the charges against them. The jury found Diaz guilty of conspiring to commit Hobbs Act robberies and not guilty of the substantive charge of attempting to rob Real Deal Jewelry.

### E. Sentencing

As relevant to this appeal, the pre-sentence investigation report ("PSI") for Diaz concluded that her testimony had been false because the jury implicitly rejected it. Accordingly, the PSI recommended an increase to the offense level based on obstruction of justice. Her PSI also recommended a decrease based on her limited

role in the offenses.  Diaz objected to the obstruction-of-justice increase and argued that the court should vary below the guidelines because Pineda had allegedly been mentally abusive towards her, she had no prior criminal history, and she had two children.

Mustelier's PSI and Pineda's PSI both calculated their base offense levels in part based on the amount of property loss attributable to their crimes.  The PSIs suggested a two-level increase for the loss amount being between $95,000 and $500,000.  The PSIs also suggested a four-level increase for their roles as leaders or organizers (or both) of the scheme.  Both Mustelier and Pineda objected to those aspects of their PSIs.

At a joint sentencing hearing, the court overruled Mustelier's and Pineda's objections to the PSI's conclusion that they had been leaders of the scheme.  The court invited argument about the loss-amount calculation.  In response, the lawyers for the defendants argued that the loss calculation was not adequately supported by the evidence at trial because the evidence did not include an inventory of the lost property or invoices showing the lost property's value.  The court overruled that objection based on its recollection that the manager of one of the stores had testified that he estimated that his store had lost about $250,000 worth of jewelry.

The court also overruled Diaz's objections.  It said that, in her testimony at trial, she had "denied guilt," which had not been truthful.  The court declined to

14

follow the PSI's suggestion to find that Diaz had played a minor role in the crimes, instead concluding that she played "a different role" by "casing" the jewelry stores. The court further reasoned that the guidelines already took Diaz's different role into account in that the guidelines recommended an "obviously lower" sentence.

After hearing the parties' arguments on sentencing, the court imposed its sentences. It sentenced Diaz to 51 months in prison, Pineda to an aggregate term of 572 months in prison, and Mustelier to an aggregate term of 624 months in prison.[3]  In pronouncing Mustelier's sentence, the court did not specifically describe Mustelier's sentence for being a felon in possession of a firearm. However, Mustelier's written judgment reflected a concurrent term of 20 years in prison for that count.

---

[3]  Pineda's term was composed of 188 months on each of the two counts for Hobbs Act robbery (Counts 2 and 4), the one count for conspiracy to commit Hobbs Act robbery (Count 1), and the one count for attempt to commit Hobbs Act robbery (Count 6), all to run concurrently with one another; 84 months on the first conviction for brandishing a firearm in furtherance of a crime of violence (Count 3), to run consecutively to the sentences on Counts 1, 2, 4, and 6; and 300 months on the second conviction for brandishing a firearm in furtherance of a crime of violence (Count 5), to run consecutively to the sentences on Counts 1, 2, 4, 6, and 3. Mustelier's term was composed of 240 months on each of Counts 1, 2, 4, 6, and 7 (felon in possession of a firearm and ammunition), all to run concurrently with one another; 84 months on Count 3, to run consecutively to the sentences on Counts 1, 2, 4, 6, and 7; and 30 months on Count 5, to run consecutively to the sentences on Counts 1, 2, 4, 6, 7, and 3.

## II.    Discussion

### A. The district court did not err in denying Mustelier's suppression motion

On appeal, Mustelier reiterates the factual arguments for suppression that he made before the district court.  But our review of the record reveals no clear error in the district court's determination that the officers had consent to enter the home.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980).  However, "[a] search is reasonable and does not require a warrant if law enforcement obtains voluntary consent."  *United States v. Spivey*, 861 F.3d 1207, 1213 (11th Cir. 2017).  And a search pursuant to a party's consent is lawful even if the party lacked authority to give consent, as long as "the facts available to the officer at the moment" would allow an officer "of reasonable caution" to believe that the consenting party had authority over the premises.  *Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990); *United States v. Barber*, 777 F.3d 1303, 1305 (11th Cir. 2015).

We review for clear error the factual determinations of the district court in denying a suppression motion.  *United States v. Barron-Soto*, 820 F.3d 409, 415 (11th Cir. 2016).  Further, credibility determinations fall "within the province of the

16

factfinder," and we will disrupt them only if the court's ultimate conclusion was "so inconsistent or improbable on its face that no reasonable factfinder could accept it." *United States v. Pineiro*, 389 F.3d 1359, 1366 (11th Cir. 2004). Here, the court's decision to credit the officers' testimony over the defense witnesses' version of events was not clear error.

Mustelier did not present his remaining arguments to the trial court, so they are subject to plain-error review. *United States v. Cavallo*, 790 F.3d 1202, 1237 (11th Cir. 2015). He identifies some discrepancies between Hernandez's testimony and Ramos's testimony, but the trial court's decision to credit their account despite those discrepancies was not plain error. Further, Mustelier suggests that the court's decision was erroneous because Lima lacked authority to consent. But the problem for Mustelier here is that, at a minimum, Lima had the apparent authority to give Hernandez consent to enter. *See Rodriguez*, 497 U.S. at 188-89. In short, we find no error in the district court's resolution of Mustelier's motion to suppress.

### B. The district court's jury-selection procedure was not an abuse of discretion

On appeal, Mustelier and Diaz argue that the jury-selection procedure interfered with their lawyers' ability to exercise peremptory challenges and that the court's refusal to grant the defense more peremptory challenges was an abuse of discretion. We disagree.

17

We review for abuse of discretion the district court's procedure to regulate the selection of jurors and the parties' exercise of peremptory challenges. *United States v. Isom*, 88 F.3d 920, 923 (11th Cir. 1996). Rule 24 of the Federal Rules of Criminal Procedure provides that, in a non-capital felony case, "[t]he government has 6 peremptory challenges and the defendant or defendants jointly have 10 peremptory challenges." Fed. R. Crim. P. 24(b)(2). The rule also says that "[t]he court may allow additional peremptory challenges to multiple defendants, and may allow the defendants to exercise those challenges separately or jointly." Fed. R. Crim. P. 24(b).

"The exercise of peremptory challenges is a statutory- or rule-based right, and is 'not of federal constitutional dimension.'" *United States v. Lopez*, 649 F.3d 1222, 1242 (11th Cir. 2011) (quoting *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000)). And we have previously held that the district court "is not required to give the defense side any extra peremptory challenges in multiple defendant trials." *Id.* (citing *Stilson v. United States*, 250 U.S. 583, 586-87 (1919)).

Diaz argues that the district court abused its discretion by not allowing the defense lawyers to confer with each other privately and further abused its discretion when it refused to give the defense additional peremptory challenges. But as it pertains specifically to "the use of the peremptory challenges in jury selection," Diaz has not alleged that there was "any actual conflict" among the defendants, and she

18

has not shown that "the jury as finally selected was other than representative and impartial." *United States v. Hooper*, 575 F.2d 496, 498 (5th Cir. 1978). Diaz did not argue in her opening brief that any of the defendants' denied for-cause challenges should have been granted, though she does raise the issue in reply. By failing to raise the argument in her opening brief, Diaz robbed the Government of its usual opportunity to respond to it. For that reason, we generally find that an appellant abandoned such an argument and decline to reach it. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1306 n.1 (11th Cir. 2018). We therefore do not need to address whether the district court's procedure was an abuse of discretion since, assuming *arguendo* that it was, Diaz has not shown that the error was prejudicial. *Hooper*, 575 F.2d at 498.

In this case, however, in a supplemental-authority filing and at oral argument, the Government had an opportunity to respond to Diaz's argument that two of her for-cause challenges should not have been denied. In particular, Diaz asserted that the district court should have allowed her to strike Jurors Vaughn and St. Felix.

Vaughn's father, who died before trial, was previously a chief of police at a different police department than any involved in this case. The court specifically asked her whether that was "going to make [her] feel towards one side or another," and she responded, "No, Sir." As for St. Felix, Diaz complained she should have been stricken for cause because, as a dental hygienist with a full schedule and no

19

coverage, she sought to be excused from jury duty. But like Vaughn, St. Felix expressly stated that she could "be fair to all sides," regardless. On this record, there is no basis for finding that the district court erred in declining to excuse Vaughn and St. Felix for cause. Therefore, as an independent basis for affirming the district court's jury-selection procedure, we conclude that Diaz has not shown that she was prejudiced by it because she has not demonstrated that her jury was other than representative and impartial.[4]

Mustelier similarly argues that the district court's jury-selection procedure violated his right to a trial by an impartial jury. However, like Diaz, he has failed to show that any partial juror was seated over his objection. Indeed, he was able to exercise the majority of the defendants' 10 allotted peremptory challenges, and the district court granted every one of his for-cause challenges.

### C. The evidence of Mustelier's guilt was legally sufficient

On appeal, Mustelier argues that the evidence of his guilt was legally insufficient because none of the store employees identified him as one of the robbers and because the evidence found at his home was "perfectly consistent with legal activities."

---

[4] At oral argument, counsel for Diaz also suggested that the district court's jury-selection procedure was an abuse of discretion because it did not allow the defense lawyers further time to question the particular jurors whom she identifies in her brief. But Diaz did not argue in her briefs that the district court's procedure was an abuse of discretion for this reason, so she has abandoned her argument to that effect. *Hornsby-Culpepper*, 906 F.3d at 1306 n.1

We review *de novo* the denial of a Rule 29 motion for a judgment of acquittal, viewing the evidence in the light most favorable to the Government and making all reasonable inferences and credibility choices in the Government's favor. *United States v. Cooper*, 926 F.3d 718, 734 (11th Cir. 2019). Viewing the evidence at trial in the light most favorable to the jury's verdict, we conclude the evidence of Mustelier's guilt was legally sufficient. The jury heard the recordings of the motel meetings in which Pineda told Janet that he pulled robberies with the "old man," who was his mistress's father. Pineda's mother told the jury that Pineda's mistress was Karina Mustelier, defendant Mustelier's daughter. Putting two and two together, the jury was entitled to conclude that Mustelier was the "old man" who pulled robberies with Pineda.

The jury also heard testimony that, after Pineda told Janet that he would retrieve the SIG Sauer pistols and bring the "old man" for her to meet, Pineda went directly to Mustelier's home, which is where law enforcement later found two SIG Sauer pistols. And powerful evidence also showed that inside Mustelier's residence, law enforcement found some of the jewelry taken from the robbed stores. Plus, one of the jewelry-store employees testified that one of the robbers had wrinkles by his eyes. Based on that evidence, a reasonable jury could conclude that Mustelier was guilty of the charged crimes.

21

D. <u>The district court did not abuse its discretion when it declined to compel disclosure of the identity of "Eddie"</u>

At the end of the first day of trial, counsel for Diaz asked the court to order the Government to reveal the identity of "Eddie," the non-testifying confidential informant who had attended the recorded motel meetings with Janet. Counsel asked the court for an opportunity to explain his motion *in camera* because his reason for asking for the informant's identity involved the content of Diaz's potential testimony. The court did not allow counsel to explain the basis for the motion *in camera* and denied the motion.

On appeal, Diaz argues that if she had received the opportunity to explain her motion *in camera*, she would have revealed to the court that she planned to testify that "Eddie" had told her to go along with whatever Pineda told Janet and that she was not involved in the robberies. And, she said, Eddie's testimony would have corroborated her testimony. She contends that the trial court abused its discretion by not allowing counsel to explain the basis for his motion *in camera*. We disagree.

We review for abuse of discretion the district court's decision to not reveal the identity of a confidential informant. *United States v. Gutierrez*, 931 F.2d 1482, 1490 (11th Cir. 1991). The Government enjoys a limited privilege to withhold from disclosure the identity of its informants. *Roviaro v. United States*, 353 U.S. 53, 59-61 (1957). But if disclosure is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a case, the privilege must give way." *Id.* at 60-

22

61. There is no "fixed rule with respect to disclosure," but the decision "calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense . . . taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 62. Applying that balancing test, we have focused on three factors: (1) the extent of the informant's participation in the criminal activity, (2) the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant, and (3) the government's interest in non-disclosure. *United States v. Gutierrez*, 931 F.2d 1482, 1490-91 (11th Cir. 1991); *United States v. Tenorio-Angel*, 756 F.2d 1505, 1509 (11th Cir. 1985).

Importantly, the burden to show that the identity of the confidential informant should be revealed falls on the defendant seeking the release of that information. *Gutierrez*, 931 F.2d at 1491; *Tenorio-Angel*, 756 F.2d at 1511. Here, though the district court denied Diaz's motion to disclose the confidential informant's identity, it left the door open to reconsider the request if counsel renewed it after Diaz testified, as counsel announced she would. Notably, though, counsel did not renew his request to disclose Eddie's identity after Diaz testified to her version of events. And Eddie's identity was made known to Diaz during trial. On cross-examination, Pineda stated that Eddie was his drug dealer, that Eddie's true name was Jose Eduardo, and that Eddie met with him regularly.

23

But even if we overlook counsel's decision not to renew the motion to disclose the informant's identity, "[m]ere conjecture about the possible significance of [the confidential informant's] testimony is insufficient to compel disclosure." *Gutierrez*, 931 F.2d at 1491 (citing *United States v. Kerris*, 748 F.2d 610, 614 (11th Cir. 1984)). Yet here, that's all the record contains.

Diaz does not point to any evidence that Eddie would have corroborated her planned testimony that he had instructed her to pretend to go along with the meetings despite her having had no involvement in the robberies. She offers only "pure conjecture" about what "Eddie" might have described at trial. *Gutierrez*, 931 F.2d at 1491.

Her situation is entirely unlike the facts of *United States v. Rutherford*, 175 F.3d 899 (11th Cir. 1999), upon which she relies. In *Rutherford*, the defendant was accused of doing a drug deal with two confidential informants. 175 F.3d at 901-902. At trial, the defendant's civil lawyer testified at the defendant's criminal trial that he had been with the defendant at the time of the supposed transaction. *Id.* The trial court denied the defendant's motion to compel production of the informants' identities. *Id.* We reversed the district court's decision, since the civil lawyer's testimony "established [a] direct relationship between [the defendant's] defense and the testimony sought." *Id.* at 902. Here, by contrast, Diaz does no more than speculate that

24

the informant's testimony would be helpful to her defense, without pointing to any indication in the record that supports her theory.

Plus, Diaz's post-*Miranda* statement contradicted her suggestion in her trial testimony that Pineda talked and bragged about the robberies at the meeting only because he was going to be paid to do so, not that he had actually participated in the robberies. In her post-*Miranda* statement, for example, she gave complete details on how she understood Pineda and the "old man" executed the robberies—details she said she had overheard Pineda discuss in telephone conversations with others before Pineda was ever arrested. This further indicates that Diaz's argument that the informant's testimony would have been helpful was no more than speculation.

Ultimately, even if Diaz had had an opportunity to explain the basis for her motion to compel the identity of the confidential informant, the district court would have not have abused its discretion in denying the motion.

> E. The district court did not abuse its discretion by admitting evidence of Pineda's prior bad acts

During trial, the district court admitted Pineda's recorded statements in which he discussed the charged robberies as well as other, unspecified prior crimes. The district court denied a motion for a mistrial based on the admission of the evidence about other crimes. On appeal, Pineda argues that the recordings of him discussing other crimes should not have been admitted into evidence. We disagree.

25

In general, relevant evidence is admissible. Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable that it would be without the evidence" and if "the fact is of consequence in determining the action." Fed. R. Evid. 401. Under Rule 404, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But, the rule provides that evidence of a prior bad act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Even where evidence is relevant, a court may exclude it "if its probative value is substantially outweighed by the risk of," among other things, "unfair preju-dice." Fed. R. Evid. 403.

We review a district court's decision to admit evidence for an abuse of discre-tion. *Barron-Soto*, 820 F.3d at 415. In balancing evidence's probative value against its unfair prejudice, we "look at the evidence in a light most favorable to its admis-sion, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006).

When we apply those standards, we conclude the district court did not abuse its discretion when it admitted the evidence that Pineda says should have been ex-cluded. To the extent that the recording of Pineda boasting about his ability to rob

26

jewelry stores referred to his efforts in the charged robberies, those statements were relevant and admissible to prove his guilt of the charged crimes. And to the extent that his boasting referred to uncharged robberies, we have previously stated that "evidence of uncharged conduct that is part of the same scheme or series of transactions and uses the same *modus operandi* as the charged offenses is admissible as intrinsic evidence outside the scope of Rule 404(b)." *United States v. Ford*, 784 F.3d 1386, 1394 (11th Cir. 2015). Pineda's robbery spree, a string of idiosyncratic heists, is exactly that sort of scheme.

Pineda's statements about selling the confidential informant guns were also admissible. A key issue at trial was Mustelier's identity as one of the robbers. After Pineda told the confidential informant that he would retrieve the SIG Sauer pistols to sell her and also bring the "old man" for her to meet, Pineda proceeded to Mustelier's address. And two SIG Sauers were subsequently found in Mustelier's room. That evidence was all admissible to prove that Mustelier was the "old man" who had participated in the robberies.

Evidence of Mustelier's possession of false identification was admissible as well. As we have previously stated, an accused's "assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *United States v. Borders*, 693 F.3d 1318, 1324 (11th Cir. 1982).

27

Pineda also argues that the evidence we have discussed above in this section should have been excluded under Rule 403. Viewing that evidence in the light most favorable to its admission, however, we conclude there is no question that the identified evidence was admissible. *Smith*, 459 F.3d at 1295.

### F. The Government's loss of a Home Depot receipt did not violate due process

During Detective Gene Delima's testimony, counsel for Diaz asked him to produce a Home Depot receipt found during law enforcement's search of Diaz's car and pictured in a photograph. Delima responded that the receipt should be in evidence. Outside of the presence of the jury, the court ordered the Government to produce the receipt. Delima later testified that he had looked for the receipt but that he could not find it. Counsel for Diaz moved to dismiss the case on the basis that the photographs of the receipt did not show the receipt's date and that the date of the receipt would have been exculpatory. The district court denied the motion.

On appeal, Diaz argues that the Government's loss of the Home Depot receipt violated *Brady v. Maryland*, 373 U.S. 83 (1963), because the receipt was exculpatory and that the Government violated *Arizona v. Youngblood*, 488 U.S. 51 (1988), because it failed to preserve potentially useful defense evidence.

The district court's conclusion that the loss of evidence did not violate the Due Process Clause presents a mixed question of law and fact, and we review the court's factual conclusions for clear error and legal conclusions *de novo*. *United States v.*

28

*Brown*, 9 F.3d 907, 910 (11th Cir. 1993).  The district court did not err when it denied Diaz's motions.

To establish a violation of due process under *Brady*, a defendant must "prove that the prosecution withheld favorable evidence and that he was prejudiced as a result."  *United States v. Hano*, 922 F.3d 1272, 1292 (11th Cir. 2019) (quotation marks omitted).  A *Brady* claim is subject to a "materiality requirement," meaning that Pineda must also "raise a reasonable probability . . . that had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.*  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  *Id.*

To establish a violation of due process under *Youngblood*, a defendant must show that the lost evidence "was likely to significantly contribute to his defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984).  To prevail under *Youngblood*, Pineda must also show that the evidence had both "an exculpatory value that was apparent before the evidence was destroyed" and that it was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *United States v. Brown*, 9 F.3d 907, 910 (11th Cir. 1993).  Further, "failure to preserve this 'potentially useful evidence' does not violate the due process clause 'unless a criminal defendant can show bad faith on the part of the police.'"

*Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) (quoting *Youngblood*, 488 U.S. at 58).

Pineda has not shown, as *Brady* requires, a reasonable probability that the outcome of his trial would have been different had he had the Home Depot receipt. Neither has he demonstrated that the receipt was likely to significantly contribute to his defense, as is required to show a *Youngblood* violation. Pineda argues that the receipt would have post-dated the charged robberies and that it would have shown that power tools found in the car were not evidence of the robberies. But the jury heard the recordings of Pineda himself describing his role in the robberies in detail, so a receipt post-dating the robberies would have been unlikely to persuade the jury that he was not involved. And perhaps more importantly, the jury heard testimony that the robbers had left their power tools behind at each jewelry store after the robbery, which would have logically necessitated the purchase of new power tools *after* each robbery. So even if the receipt post-dated the charged robberies, the jury would have been just as likely to surmise that it was inculpatory as exculpatory.[5]

## G. Pineda's ankle restraints did not deny him a fair trial

Pineda argues that the district court should have granted his motion for a new trial because he had ankle restraints on when he walked to the witness stand to

---

[5] Even if Pineda could demonstrate that the receipt would have significantly contributed to his defense, his *Youngblood* claim would still fail because he cannot show that the Government acted in bad faith. In fact, Pineda's brief does not even allege bad faith on the Government's part.

30

testify. The Government concedes that it was error for the district court to allow Pineda to testify while wearing the restraints but argues that the error was harmless beyond a reasonable doubt because the district court did not clearly err when it found that the jury was not aware of the restraints. Reviewing the district court's findings of fact for clear error, and its determination that the error was harmless *de novo*, *see Mason v. Allen*, 605 F.3d 1114, 1123 (11th Cir. 2010), we affirm the district court's finding that the error was harmless beyond a reasonable doubt.

In *Deck v. Missouri*, the Supreme Court held,

> [T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

544 U.S. 622, 629 (2005). In the absence of justification for the use of restraints, their use is presumptively prejudicial. *Id.* at 633. However, the prosecution can rebut that presumption by proving, beyond a reasonable doubt, that the error did not contribute to the verdict. *Id.*; *Jones v. Sec'y, Fla. Dep't of Corrs.*, 834 F.3d 1299, 1320 (11th Cir. 2016).

In deciding Pineda's motion, the district court took photographs of the courtroom from the jury's perspective and listened to the audio recording of Pineda's walk from counsel's table to the witness stand. It made a factual finding that the

31

jury could not have seen Pineda's restraints because, though there was a "little gap" where the jury might have been able to see Pineda's restraints, an interpreter had been in that gap and would have occluded the jury's view. And when the court listened to the court reporter's audio recording from the bench, which was closer to the court reporter and witness box than the jury box was, the district judge said that it heard something "slightly" at "the beginning" but then, when it was "really trying to listen" for the restraints, that it did not hear them.

We will find clear error only where we are left with a definite and firm conviction that a mistake has been committed. *United States v. Tejas*, 868 F.3d 1242, 1244 (11th Cir. 2017). Here, nothing in the record leaves us with that conviction. We affirm the district court's decision to deny Pineda's motion for a mistrial because we cannot say its findings of fact were clearly erroneous.[6]

### H. The court's conduct during trial was not reversible error

#### i. The Court's Statement About the Jewelry Found in Mustelier's Home

Mustelier argues that the district court improperly vouched for the Government's evidence when it referred to the jewelry found in Mustelier's home as being

---

[6] Since we conclude that the district court did not clearly err when it found that the jury was not aware of Pineda's restraints, we need not reach the argument that the Government raised for the first time during oral argument that the error was also harmless because of the strength of the evidence against Pineda.

32

the jewelry that was taken from the robbed stores.  He argues that the court should have granted his motion for a mistrial on that basis.  We are not persuaded.

During trial, counsel for Mustelier objected to testimony about jewelry found in Mustelier's home but not in Mustelier's own bedroom.  In response to the objection, the prosecutor explained that the Government would "have testimony" that it was "the jewelry that was found—" and, completing the prosecutor's sentence, the court said, "[t]he jewelry that comes from the jewelry stores?"  The prosecutor confirmed that the Government's theory was that some of the jewelry found in the house was the same jewelry taken from the robbed stores.  The court concluded that the evidence was therefore relevant and overruled the objection.

In the full context of the court's statement, the district court did not vouch for the Government's evidence.  Rather, the court merely acknowledged it understood the Government's theory of the evidence's relevance.  In describing the basis on which it was overruling Mustelier's objection, the court did not stray from neutrality as Mustelier contends.  *United States v. Harriston*, 329 F.3d 779, 789-90 (11th Cir. 2003).

### ii.  The Court's Conduct Towards Counsel for Diaz

Diaz argues that the court's conduct towards her trial lawyer in general constituted advocacy in the Government's favor.  After a careful review of the record,

33

we conclude that the district court did not abuse its discretion in managing the trial proceedings.

"A district court has wide discretion in managing the proceedings" and "may comment on the evidence, question witnesses, elicit facts not yet adduced or clarify those previously presented, and maintain the pace of trial by interrupting or cutting off counsel as a matter of discretion." *United States v. House*, 684 F.3d 1173, 1209 (11th Cir. 2012). We find that a court abused its discretion in its exercise of those powers only when "the judge's conduct strays from neutrality, and even then only when his remarks demonstrate pervasive bias and unfairness that actually prejudice a party." *United States v. Hill*, 643 F.3d 807, 846 (11th Cir. 2011).

A recurring theme at trial was counsel for Diaz's improper questions during cross-examination. The court routinely warned counsel against asking argumentative questions and commenting on the witness's testimony during cross-examination. But counsel persisted in flouting the court's clear instruction, and after several warnings in the course of counsel's cross-examination of Detective Martin Alvarez, the court ended counsel's cross-examination.[7] The pattern repeated itself with

---

[7] After warning counsel multiple times to refrain from arguing with the witness and commenting on the evidence, the following exchange resulted in the district court's announcement that counsel's cross-examination of Alvarez was over:

Q:    So this informant, snitch, that work[s] for you, if I want to bring him here, I can't, can I?
A:    I don't know, Sir.
Q:    You lost touch with him?

34

counsel's cross-examination of Janet Hernandez, the Government's confidential informant. Counsel repeatedly asked improperly argumentative questions and made extraneous comments during cross-examination, and the court again repeatedly warned him against that conduct. Upon the final instance of counsel's intransigence and after counsel had questioned the witness for a total of roughly an hour and 40 minutes, the court ended counsel's opportunity to cross-examine the witness. The court later observed that it had been forced to interfere during the trial more than it ever had and that it had "never found more need to do so."

The court also observed that it had treated the lawyers for the defense and the lawyers for the government in "more or less the same" way, and we agree with the court's assessment. The court regularly interrupted the Government's direct examinations when it said that the Government was asking leading questions and not continuing at a fast-enough pace, saying "[w]rap it up," "[n]ext question," "[l]et's go. Let's go. Any other questions?" And just as the court directed defense counsel to "ask [his] best questions first," the court also told the Government to ask its "best questions first" and prompted the Government to finish its questioning quickly. Any difference between the court's conduct towards the prosecutors and towards counsel

---

A:    I no longer work in that unit. I'm a supervisory of the robbery unit now. So I no longer work with confidential informants.

Q:    Thank God.

for Diaz is due solely to the fact that the prosecutors heeded the court's instructions and counsel for Diaz ignored them.

We likewise conclude that *United States v. Nazarro*, 472 F.2d 302 (2d Cir. 1973), does not support a different conclusion. Of course, *Nazarro* is not binding on us. But even if it were, it is distinguishable. There, the district judge frequently and "unmistakably rehabilitated a prosecution witness whose credibility had been undermined by defense counsel." *Id.* at 307. Similarly, in *Nazarro*, the district court asked questions that appeared to be "designed to inject doubt or uncertainty as to the credibility of a defense witness." *Id.* Here, by contrast, the district judge did not engage in conduct aimed at undermining or vouching for any particular witness. Rather, the district judge's conduct was aimed instead at managing the trial.

Ultimately, we find that the district court's conduct towards counsel for Diaz did not fall outside its discretion to manage the proceedings and that, especially in light of the court's analogous conduct towards the Government, the court did not stray from neutrality or demonstrate a "pervasive bias and unfairness that actually prejudice[s] a party." *Hill*, 643 F.3d at 846.

Nor, as Diaz asserts, did the district court's termination of her counsel's cross-examination violate her Sixth Amendment rights on this record. Even assuming without deciding that the district court erred in cutting cross-examination, any error is subject to harmless-error review. *United States v. Ndiaye*, 434 F.3d 1270, 1286

36

(11th Cir. 2006). Here, Diaz failed to clearly articulate on appeal how she was prejudiced or harmed by her inability to engage in further cross-examination of either witness, other than to conclusively assert that they were "key witnesses." And our examination of the record does not reveal any prejudice or harm, either.

I.    Defendants' sentences are reasonable, with one exception

All three defendants appeal aspects of their sentences. After careful review, we affirm their sentences—except for Mustelier's sentence for being a felon in possession of a firearm, which is illegally high. We vacate Mustelier's sentence for that crime and remand his case to the district court for him to be resentenced on Count 3.

Most of the arguments on appeal concern the district court's findings of fact. The district court was entitled to base its factual findings on "evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing." *United States v. Hamaker*, 455 F.3d 1316, 1338 (11th Cir. 2006). We review those factual findings for clear error. *Tejas*, 868 F.3d at 1244. Where the parties dispute a fact underlying the court's sentence, the Government bears the burden to prove the fact by a preponderance of the evidence "by presenting reliable and specific evidence." *United States v. Rodriguez*, 732 F.3d 1299, 1305 (11th Cir. 2013). We review the district court's factual findings at sentencing for clear error, its legal conclusions *de novo*, and its application of the Sentencing Guidelines with

37

due deference, which is tantamount to clear-error review. *Tejas*, 868 F.3d at 1244. We otherwise review the procedural reasonableness of a sentence for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 41 (2007).

First, Diaz argues that her sentence is procedurally unreasonable because the court concluded that she obstructed justice and that her role in the crimes was not minor. We affirm her sentence.

Under United States Sentencing Guidelines Manual ("USSG") § 3C1.1, if the district court finds that the defendant obstructed justice or perjured herself at trial, the district court applies a two-level increase to the offense level. *United States v. Williams*, 340 F.3d 1231, 1240 (11th Cir. 2003). An increase in sentence based on obstruction of justice is not intended to punish the exercise of a constitutionally protected right, such as denying guilt while not under oath, but the denial of guilt under penalty of perjury warrants application of the adjustment. *See* USSG § 3C1.1, cmt. (n.2). Perjury is "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Singh*, 219 F.3d 756, 763 (11th Cir. 2002). When applying § 3C1.1, the district court should make specific findings as to each alleged instance of obstruction of justice, but it may make a general finding if the record demonstrates that the defendant gave sworn testimony that was willfully and materially false. *Id.* at 763, 763 n.4.

38

Here, the district court found that Diaz's testimony at trial had been perjury. At trial, the jury heard the recorded audio of the motel meetings, in which Diaz said that she supported Pineda's jewelry-store-robbery schemes by gathering information about the stores in advance of the robberies. When Diaz testified in her own defense, she told the jury that she made the statements in the recording only because she had been told to go along with whatever Pineda said and that she had not in fact been involved in the robberies.

Diaz argued that the district court should not have concluded that her testimony was perjury because her testimony only added context to her recorded statements without denying that she had made those statements. She renews that argument on appeal. But Diaz's testimony materially contradicted her recorded statement. In the recording, she purported to support Pineda's scheme. In her testimony, she denied playing any role. Yet significantly, in convicting her of the conspiracy count, the jury clearly rejected Diaz's testimony. We therefore cannot say that the district court, which also had the opportunity to assess Diaz's "demeanor, apparent sincerity, intonation, expression, gesticulations, and a wide range of other considerations that are pertinent in determining" whether she perjured herself, clearly erred when it found that her recorded statement had been the truth and her testimony false. *Williams*, 340 F.3d at 1240.

Diaz also argues that the district court should have found that she played a minor role in the crimes. But again, we find no reversible error.

When determining whether to apply a minor-role reduction under USSG § 3B1.2(b), courts should consider (1) the defendant's role in the relevant conduct for which she is being sentenced and (2) her role as compared to the other participants in the criminal conduct. *United States v. Cruickshank*, 837 F.3d 1182, 1192 (11th Cir. 2016). Courts should also consider the defendant's understanding of the scope of the crime, participation in the planning or organization of the crime, degree of the defendant's decision-making authority, and how much the defendant stood to benefit from the crime. *See* USSG § 3B1.2, cmt. (n.3(C)). The sentencing court need not make specific factual findings; "a simple statement of the district court's conclusion" is sufficient as long as it resolves the disputed factual issues. *United States v. De Varon*, 175 F.3d 930, 939 (11th Cir. 1999) (*en banc*). Here, the district court determined that Diaz did not play a minor role because she played a "different" role in the crime, helping to plan the robberies and supporting her husband's role. It was not clear error for the district court to find that Diaz's role was not minor.[8]

---

[8] Diaz also appears to argue that the district court erred because it did not refer to the factors described in 18 U.S.C. § 3553(c). To the extent that Diaz presents that argument to us, we reject it, since the record reflects that the district court did, in fact, expressly consider those factors.

Next, we turn to Pineda's and Mustelier's sentences. We affirm those sentences for the substantive Hobbs Act robbery convictions and for the conspiracy conviction.

Pineda and Mustelier argue that the district court clearly erred when it found that their crimes caused at least $95,000 worth of property loss. Under USSG § 2B3.1, a district court determines the offense level for robbery by taking account of, among other things, the resulting property loss. That guideline considers the "value of the property taken, damaged, or destroyed." USSG § 2B3.1, cmt. (n.3). Loss calculations need not be made with precision and need be only a reasonable estimate, given the available information. USSG § 2B1.1, cmt. (n.4(C)). Nevertheless, the amount of loss must be proven by a preponderance of the evidence and with "reliable and specific evidence." *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007).

Here, the district court pointed to trial testimony from the manager and owner of Luany's Jewelry, who said that the store had lost $17,000 in cash and between $250,000 and $500,000 in jewelry. At oral argument, counsel for Mustelier emphasized that the owner testified that he did not personally maintain the store's inventory, that an employee would inventory and photograph the jewelry in the store every few months, and that the inventory he provided to law enforcement therefore did not accurately reflect the precise inventory of the store on that date.

41

For the purposes of determining whether the property loss attributable to defendants' crimes was at least $95,000, the store owner's approximation was reliable and specific enough to support the district court's conclusion. The district court was entitled to presume that the jewelry-store owner was generally familiar with the store's books and the approximate value of the store's inventory.

This case is unlike *United States v. Sheffield*, ___ F.3d ___, 2019 WL 4784937 (11th Cir. Oct. 1, 2019), on which Mustelier relies. In *Sheffield*, we held that when losses are "definite and easy to calculate," precision is required in determining the amount of restitution the defendant must pay. *Id.* at *3. Assuming without deciding that this rule applies equally to determining loss amount for purposes of establishing the correct loss enhancement to apply to the base offense level, here, the jewelry-store owner attested that he could not precisely calculate the loss because inventory varied on a daily basis. In addition, jewelry that was recovered from Mustelier's home was not all of the stolen jewelry, as it was not located until more than a year after the robbery. Here, even the low end of the approximation the jewelry-store owner provided during trial—between $250,000 and $500,000—far exceeded the $95,000 threshold in the Sentencing Guidelines.

Jewelry-store employee Martinez's statements also do not undermine the reliability of the store owner's testimony. Mustelier notes that Martinez identified as stolen from her jewelry store only eleven of 364 pieces of jewelry seized from

42

Mustelier's residence. But significantly, the jewelry was not seized from Mustelier's residence until roughly 15 months after the robbery of the store occurred, leaving Mustelier substantial time to dispose of items. And the question the district court had to answer was the value of the property taken from the jewelry stores, not the value of the property recovered more than a year later from Mustelier's residence.

The district court likewise did not err when it increased the offense levels for Pineda's and Mustelier's sentences for being "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a). Notably, the defendant need not be the sole leader of a conspiracy to be an organizer or leader within the meaning of the Sentencing Guidelines. *United States v. Ramirez*, 426 F.3d 1344, 1355 (11th Cir. 2005).

Here, unobjected-to facts in Pineda's and Mustelier's PSIs support the district court's decision to increase their offense levels based on their leadership roles. The PSIs described how the robberies involved at least five people, including Mustelier, Pineda, Diaz, Pineda's cousin, and another "big and tall" man. They described how much of the equipment was stored at Mustelier's house, which indicated that he exercised some degree of control over the robberies' execution. And while Pineda characterized Mustelier as the "brain of the organization," Pineda also recruited his own crew, acquired his own equipment, and directed others to gather information about the targeted stores. In light of those facts, the district court did not clearly err

43

when it determined that both Pineda and Mustelier[9] were organizers or leaders of the criminal organization.

Finally, we agree with Mustelier that we must vacate his sentence for his conviction for being a felon in possession of a firearm. By statute, a conviction for violating 18 U.S.C. § 922(g)(1) carries a maximum sentence of 10 years in prison. 18 U.S.C. § 924(a)(2). As the Government concedes, Mustelier's 20-year sentence for that crime is illegally high. We therefore vacate it and remand his case so that he can be resentenced on that count.

## III.    Conclusion

We affirm the defendants' convictions. And with the exception of Mustelier's sentence for possessing firearms on Count 7, we affirm the defendants' sentences. We vacate Mustelier's sentence for possessing firearms and remand his case for resentencing on that count.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**

---

[9] In his briefs, Mustelier had also argued that the district court did not adequately explain its variance relating to Mustelier's criminal history. At oral argument, however, Mustelier withdrew that argument, based on a review of the district court's statement of reasons supporting the sentence it imposed. We therefore do not address that argument.

44